[No. B184629. Second Dist., Div. Two. June 28, 2006.]

CARSON REDEVELOPMENT AGENCY, Plaintiff and Respondent, v. MICHAEL PADILLA et al., Defendants and Appellants.

## Counsel

Jay M. Coggan & Associates, Jay M. Coggan, Heather E. Sterling; Law Offices of Joseph W. Singleton and Joseph W. Singleton for Defendants and Appellants.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Anthony R. Taylor for Plaintiff and Respondent.

OPINION

**ASHMANN-GERST, J.**—When a public official violates the Hobbs Act, title 18 United States Code section 1951(a), by soliciting and obtaining an extortion payment in exchange for approval of a public contract, that contract runs afoul of Government Code section 1090[1] and may be avoided pursuant to section 1092.[2] Regardless of whether the third party who obtained the public contract is an innocent victim, the public entity is entitled to recover all consideration it paid to the third party. With this holding in mind, we conclude that the trial court properly granted summary judgment in favor of respondent Carson Redevelopment Agency (the Agency) on its complaint to recover $850,000 from appellants Michael and Bertha A. Padilla (the Padillas). The $850,000 was paid to the Padillas through a public contract that was approved and signed only after they paid $75,000 in extortion money to Agapito Diaz Fajardo (Fajardo), the former mayor pro tempore of the City of Carson.

We affirm the judgment entered in favor of the Agency.

**FACTS**

The Padillas are the owners of a 45-unit senior housing complex known as Camino Senior Village in the City of Carson. In 1994, the Padillas and the Agency signed the Affordable Housing Agreement (the Housing Agreement). It established that the Agency would provide the Padillas rental assistance for six years, "at a rate of not more than $295 per month per unit occupied by a Qualified Tenant, up to a maximum of 22 units." In exchange, the Padillas agreed to a rental restriction that required them to offer 22 units in Camino Senior Village as low income housing for senior citizens for at least 30 years.

In early 1999, before the rental assistance provision expired, the Padillas asked the Agency to extend the rental assistance another 24 years so it would last as long as the 30-year rental restriction. Also, they wanted the rental assistance to cover all 45 units in Camino Senior Village. In lieu of future

---

[1] All further statutory references are to the Government Code unless otherwise indicated. Section 1090 provides, in part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity."

[2] Section 1092 provides: "Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein. No such contract may be avoided because of the interest of an officer therein unless such contract is made in the official capacity of such officer, or by a board or body of which he is a member."

monthly rental assistance, the Agency proposed that the parties enter a new agreement that would require the Agency to loan the Padillas $850,000 at 4 percent to be used for a buydown of their existing mortgage on Camino Senior Village (the Buydown Agreement). Under the terms of the Buydown Agreement, the loan would be forgiven so long as the Padillas cured any defaults on their obligations.

Fajardo told Michael Padilla that he would have to pay $50,000 if he wanted the city council to approve the Buydown Agreement. Fajardo wanted $25,000 up front and another $25,000 after the Buydown Agreement was approved. Michael Padilla paid pursuant to Fajardo's demands. Subsequently, Fajardo solicited a third payment of $25,000 to secure the Agency's signature on the Buydown Agreement, and Michael Padilla once again paid.[3] Thereafter, the Agency and the Padillas signed the Buydown Agreement. It stated, inter alia, that the Padillas would provide low income housing to seniors age 55 or older in 44 of the Camino Senior Village's units for at least 24 years.

In 2003, the Agency sued the Padillas for avoidance of the Buydown Agreement pursuant to section 1090; imposition of a constructive trust and an accounting; rescission and restitution based on fraud; and declaratory relief regarding the continuing validity of the Housing Agreement. The Agency sought to recover the $850,000 paid to the Padillas.[4]

The Agency moved for summary judgment or summary adjudication with respect to each cause of action. The trial court granted summary adjudication as to the first cause of action to void the Buydown Agreement. After the Agency requested dismissal of the unresolved portions of the complaint, judgment was entered and the Padillas were ordered to pay the Agency $850,000 plus interest.

---

[3] In their reply brief, the Padillas contend that there was one payment of $50,000 and a second payment of $25,000. Our characterization of the payments comes from the deposition excerpts they attached as exhibit A to opposition to the motion for summary judgment or adjudication. In his deposition, Michael Padilla was asked: "Did you pay him the $50,000 at once?" He replied: "No; [$]25,000 for approving, [$]25,000 after approving, and then . . . . [¶] . . . he says, upon signing of the contract, that they needed [$]25,000 more for Christmas money." The Padillas contend that in Michael Padilla's declaration he states that the first payment was $50,000. He does not state that he paid $50,000 at one time, but he does state that he paid $50,000 prior to approval. When there is a discrepancy between a deposition and a declaration submitted in connection with an opposition to a motion for summary judgment, the deposition controls. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10].) We take the time to discuss this issue because the Padillas believe the timing and number of payments is significant. We do not. Even if the payments occurred as they represent, our holding would remain the same.

[4] The Padillas filed a cross-action alleging causes of action for reformation of agreement, fraud, rescission of agreement based on fraud, declaratory relief, inverse condemnation, cancellation of instrument and economic duress. Their cross-action is not at issue in this appeal.

The Padillas appealed the judgment.

## DISCUSSION

Our review of the trial court's decision to grant the Agency's motion for summary judgment is de novo. (See *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) Likewise, we consider issues of statutory interpretation without deference to the trial court; that is, we start from a blank slate. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

The principal issue in this appeal, the interpretation of section 1090, is a far-reaching one that calls upon us to examine the public policy of the State of California and carefully analyze when, if ever, individuals can retain consideration paid to them pursuant to a public contract that was secured through payments extorted by a corrupt public official.

According to the Padillas: A public contract is not void under section 1090 unless a public official is financially interested in that contract. When a public official receives a pay-to-play payment of extortion money in exchange for approval of a public contract, section 1090 is not triggered. Although the public official receives an illegal payment, he is not getting paid with public funds through a public contract and therefore does not have a cognizable financial interest in the contract.

Acknowledging case law, and duly considering public policy, our opinion takes a different tack. Section 1090 was designed to protect the public; to hold as the Padillas urge would subvert the purpose of section 1090 by giving life to contracts born of conflicts of interest. Here, there was a conflict of interest because Fajardo voted to approve the Buydown Agreement based on his greed rather than on the due diligence and integrity he owed the City of Carson. As a result, the City of Carson was entitled to recover the $850,000 paid to the Padillas. This result may be harsh for individuals such as the Padillas, but it is necessary to protect the public and encourage people like the Padillas to report people like Fajardo. No one should ever ante up an extortion payment to a public official.

Below, we examine the law and the Padillas' arguments in detail and explain why the judgment must be affirmed.

### 1. Section 1090.

As history reveals, there has long been a common law proscription against public officials having a financial interest in contracts created by them in their

official capacities. (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1230 [97 Cal.Rptr.2d 467].) In 1951, the Legislature codified the proscription when it enacted section 1090 to curb conflicts of interest with respect to contracts, purchases and sales made by public officials. (*BreakZone, supra,* at p. 1230.) Section 1090 is triggered when a public official has a direct financial interest in a contract. Even when a public official's financial interest is indirect, section 1090 will still apply unless the interest is too remote and speculative. (*BreakZone,* at p. 1230.)

■ The evil to be thwarted by section 1090 is easily identified: If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality. (See *People v. Honig* (1996) 48 Cal.App.4th 289, 314 [55 Cal.Rptr.2d 555] (*Honig*).) The lessons of human foibles and frailties teach " ' "that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government." ' [Citation.]" (*Ibid.*) For these reasons, section 1090 is aimed at *any* interest, other than an interest that is too remote or speculative, that could compromise a public official's judgment or cast doubt on whether he executed his duties with the utmost allegiance, diligence, and loyalty to his office. (See *Thomson v. Call* (1985) 38 Cal.3d 633, 647–648 [214 Cal.Rptr. 139, 699 P.2d 316] (*Thomson*) [noting that " 'no man can faithfully serve two masters whose interests are or may be in conflict' "].) Properly understood, section 1090 stands as a prophylactic against the temptations that might corrupt or influence public officials. (*Thomson, supra,* at p. 648 [" ' "the statute is more concerned with what might have happened . . . than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation" ' "]; *Honig, supra,* 48 Cal.App.4th at p. 314 ["In view of the purposes of our conflict-of-interest statutes, it is well established that their scope is not limited to instances of actual fraud, dishonesty, unfairness or loss to the governmental entity, and criminal responsibility is assessed without regard to whether the contract in question is fair or oppressive. . . . Thus, it has been repeatedly held that such matters are irrelevant under section 1090" (citation omitted)].) As *Thomson* noted: "It follows from the goals of eliminating temptation, avoiding the appearance of impropriety, and assuring the city of the officer's undivided and uncompromised allegiance that the violation of section 1090 cannot turn on the question of whether actual fraud or dishonesty was involved. Nor is an actual *loss* to the city or public agency necessary for a section 1090 violation." (*Thomson, supra,* 38 Cal.3d at p. 648, fn. omitted.)

When section 1090 is transgressed, "the public entity involved is entitled to recover any compensation that it . . . paid under the contract without restoring any of the benefits it . . . received. [Citations.] The contract is against the express prohibition of the law, and ' ". . . courts will not entertain any rights growing out of such a contract, or permit a recovery upon quantum meruit or quantum valebat." ' [Citations.] This principle applies without regard to the willfulness of the violation. 'A person who violates section 1090, regardless of whether the violation is intentional, forfeits any rights or interests flowing from the illegal contract.' [Citation.]" (*Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 583 [110 Cal.Rptr.2d 552] (*Finnegan*).)

The rule of forfeiture is not an outmoded remedy blind to equity. It is, rather, a remedy that is utilitarian in its design; it recognizes what is equitable for the community and necessarily subordinates the individual in a given case. Ultimately, this policy serves all individuals because they comprise our communities and need every guarantee the law can provide that they will be free from the tyranny of corrupt politicians and the burden of contracts tainted by conflicts of interest.

### 2. Existence of a "financial interest."

The Padillas tell us that there has not been a published California opinion in over 143 years stating whether a public official who receives an extortion payment to approve a contract has a financial interest in the contract. According to the Padillas, Fajardo did not have a financial interest or a conflict of interest. For this reason, they contend that there is no basis for applying section 1090. We disagree. In our view, Fajardo had a financial interest in the Buydown Agreement that triggered section 1090. That financial interest was neither remote nor speculative because it created an immediate and palpable conflict of interest; it divided his loyalties between his greed and promise to vote for the Buydown Agreement on one hand, and his duty to the interests of the City of Carson on the other hand.

#### a. *The Hobbs Act.*

Before reaching the issue posed by the Padillas, we must first determine whether this case involves extortion. We conclude that it does.

Title 18 United States Code section 1951(a) makes it a crime to affect commerce through extortion. Extortion is defined in title 18 United States Code section 1951(b)(2) as "the obtaining of property from another, with his consent, induced by . . . threatened force . . . or fear." As explained by *United*

*States v. Greger* (9th Cir. 1983) 716 F.2d 1275, 1278, "Courts interpreting this language have focused on the intent of the defendant to induce payment through the use of threats or the exploitation of fears in his victim, and the reasonable state of mind of the victim based on his words, actions, and perceptions. [Citations.] 'Fear' in this context has been held to include fear of economic loss."

The undisputed facts and reasonably deducible inferences[5] suggest that Fajardo exploited the fear of Michael Padilla that without the continuing rental assistance or the proposed mortgage buydown, he and his wife would no longer be able to afford the debt service on the Camino Senior Village.

### b. *An extortion payment creates an indirect financial interest.*

 Our task is to interpret section 1090 and analyze whether it was triggered by Fajardo's act of extorting money from the Padillas. As we recently stated in *Watson Land Co. v. Shell Oil Co.* (2005) 130 Cal.App.4th 69, 76–77 [29 Cal.Rptr.3d 343]: "When interpreting a statute, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] We must 'look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]' [Citation.] A close cousin of the foregoing quote is the rule ' "that the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation." [Citations.]' [Citation.]"

---

[5] Courts are required to consider the inferences from the evidence that might lead to denial of a motion for summary judgment. Code of Civil Procedure section 437c, subdivision (c) provides: "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence, except summary judgment may not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact."

■ The Padillas lobby us to restrictively interpret the phrase "city officers . . . shall not be financially interested in any contract made by them in their official capacity" in section 1090 to mean only that city officers cannot make a public contract and then obtain some kind of benefit that flows from the existence, performance or implementation of that contract. Thus, they essentially encourage us to hold that tainted public contracts escape avoidance under section 1092 as long as bribes, extortion payments or other favors received by the public officials cannot be linked directly to the terms of those tainted public contracts. Courting such a holding, however, flies in the face of case law. "[T]he Legislature was not concerned with the technical terms and rules applicable to the making of contracts, but instead sought to establish rules governing the conduct of governmental officials. [Citation.] Accordingly, those provisions cannot be given a narrow and technical interpretation that would limit their scope and defeat the legislative purpose. [Citations.]" (*Honig, supra*, 48 Cal.App.4th at p. 314.) In particular, "the term 'financially interested' in section 1090 cannot be interpreted in a restricted and technical manner. The law does not require that a public officer acquire a transferable interest in the forbidden contract before he may be amenable to the inhibition of the statute, nor does it require that the officer share directly in the profits to be realized from a contract in order to have a prohibited interest in it. [Citations.]" (*Honig, supra*, at p. 315.)

The Padillas' rejoinder to the authority against them is the following argument: "[T]he commission of crimes of extortion by public officials do[es] not create . . . prohibited financial interests, automatically voiding agreements between the victims of the extortion and the public entity, because extortion payments . . . flow . . . from the fear created and wielded by the extortionists. The [e]xtortionists do not owe their loyalty to the agreement, which is nothing more than the means to their corrupt ends, or the contracting parties who are their victims." They cite no law for this proposition, nor could they. Only by trying to revise the law to suit their purposes can they claim that public officials who are extortionists have no conflicts. Suffice it to say, this argument does not match the cases turned up by our research.

■ It is not the type, size or source of interest that a public official obtains or is promised that matters when applying section 1090. Rather, it is the potential impact of that interest on a public official's integrity that demands attention. (See *Honig, supra*, 48 Cal.App.4th at p. 315.) The sweep of section 1090 is broad; within its reach comes any interest that might deter a public official from the most righteous and noble path of civil service possible. (*Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441,

375 P.2d 289].) If any interest compromises a public official's fidelity such that "he may be influenced by personal considerations rather than the public good" (*Terry v. Bender* (1956) 143 Cal.App.2d 198, 207–208 [300 P.2d 119]), then there must be a mechanism to ameliorate the concomitant injury to society. Section 1092 is that mechanism. It would lose much of its sting if it were not permissible to unravel the machinations of criminal minds and trace their paths of deceit to pinpoint indirect financial interests that might influence public officials. (See *People v. Watson* (1971) 15 Cal.App.3d 28, 37 [92 Cal.Rptr. 860].)

■ On point is *People v. Vallerga* (1977) 67 Cal.App.3d 847 [136 Cal.Rptr. 429], a case succinctly summarized in *Honig*. In *Vallerga*, "the defendant county assessor participated with the former county assessor in demonstrations and meetings by which an assessor from another state was convinced to purchase the county's computer appraisal program from the county. The former county assessor was paid $6,000 as a consultation fee upon execution of the purchase and he paid $3,000 to the county assessor for his participation. Although the out-of-state assessor had agreed to pay only the former assessor, and the former assessor testified that he had just decided to split the payment and that there had been no understanding whatsoever to pay the county assessor, the court held that the evidence was sufficient to permit the jury to infer a promise to split the fee and that this was a prohibited financial interest under section 1090. [Citation.]" (*Honig, supra,* 48 Cal.App.4th at pp. 316–317.) In finding that section 1090 applied, the *Vallerga* court stated: "While defendant's financial interest in the contract was indirect, it was not a 'remote' interest as that term is defined in [section 1091]. The jury was properly instructed as follows: 'The interest is indirect when the county officer makes · a contract in his official capacity with an individual or entity, which individual or entity, by reason of the county officer's relationship to the individual or entity at the time the contract is made, is in a position to render actual or *potential* pecuniary benefits directly or *indirectly* to the county officer based on the making of the contract.' " (*Vallerga, supra,* 67 Cal.App.3d at p. 867.) *Vallerga* demonstrates that section 1090 applies even when a public official's financial interest flows from a source that is independent of a public contract.

■ We conclude that an extortion payment solicited by a public official in exchange for approval of a public contract creates an indirect financial interest. A public official who acts as an extortionist is not acting in the best interests of the public. Instead, he is answering to his own avarice and is wholly unfit to enter into public contracts. Contracts made by such individuals should be challengeable; hence, sections 1090 and 1092 must allow society to reverse the course set by the extortionist and turn back the clock.

This interpretation is consistent with the plain language of section 1090. The phrase "financially interested" broadly encompasses anything that would tie a public official's fortunes to the existence of a public contract. This interpretation furthers the Legislature's purpose, which is to regulate the conduct of public officials. To construe the statute narrowly would permit certain categories of schemes and improprieties to go unchecked, a result which would undermine the public's confidence not only in the government, but in the court system ruling on such cases. An important, prophylactic statute such as section 1090 should be construed broadly to close loopholes; it should not be constricted and enfeebled.

### 3. The disgorgement remedy.

The Padillas castigate the remedy requiring them to disgorge $850,000 on the following grounds: A different remedy must be fashioned for each case involving a violation of section 1090, and the trial court abdicated its duty to consider appropriate options. In this instance, a disgorgement remedy unfairly punishes the victims of extortion. Moreover, the trial court erred by granting a remedy in connection with summary adjudication of the first cause of action. That ruling did no more than determine the existence of an impermissible financial interest. Instead of entering judgment, the trial court should have held a trial regarding an appropriate remedy for Fajardo's violation of section 1090. Based on these points, the Padillas urge us to hold that a disgorgement remedy is not automatic.

These contentions lack merit.

#### a. *Disgorgement is automatic.*

The Padillas tell us that *Thomson* directs trial courts to consider the facts of each case to determine the appropriate remedy. We cannot accede to their interpretation of *Thomson*. In *Thomson*, a corporation purchased land from Call, a member of the Albany City Council, and then sold that land to the City of Albany. Due to his financial interest in what was considered a single transaction, Call was found liable for the consideration he received. Also, the City of Albany was permitted to keep the property. (*Thomson, supra*, 38 Cal.3d at pp. 637–638.) *Thomson* concluded that the trial court's remedy was "consistent with a long, clearly established line of cases." (*Id.* at p. 647.) Reviewing those cases, the court noted that "the city or agency is entitled to recover any consideration which it has paid, without restoring the benefits received under the contract. [Citations.]" (*Ibid.*) According to the court, case law supported strict enforcement of conflict of interest statutes, which was

consistent with "the primary policy concern that every public officer be guided solely by public interest." (*Id.* at p. 650.) "Resulting in a substantial forfeiture," the court indicated, "this remedy provides public officials with a strong incentive to avoid conflict-of-interest situations scrupulously." (*Ibid.*)

The court considered whether less severe remedies would have been appropriate based on the fact that Call did not commit fraud and he sought advice (albeit erroneous) from the city attorney. (*Thomson, supra,* 38 Cal.3d at p. 650.) Then the court noted: "The facts of this case represent but one of endless permutations generated by the basic conflict-of-interest situation, and a different remedy could be tailored for each." (*Id.* at p. 652.) However, the court did not hold that a different remedy would be proper in *Thomson,* or any other case involving section 1090. It held that the trial court's remedy was "consistent with the policy of strict enforcement of conflict-of-interest statutes, it provides a strong disincentive for those officers who might be tempted to take personal advantage of their public offices, and it is a bright-line remedy which may be appropriate in many different factual situations." (*Thomson, supra,* at p. 652.) The court went on to aver: "As we have seen, *civil liability* under section 1090 is not affected by the presence or absence of fraud, by the official's good faith or disclosure of interest, or by his nonparticipation in voting; nor should these considerations determine the civil remedy. For these reasons, and because of the significant public policy goals which mandate strict enforcement of conflict-of-interest statutes such as section 1090, we conclude that the remedy applied by the trial court was justified, supported by both California case law and public policy." (*Ibid.,* fn. omitted.)

 As the Padillas state in their briefs, *Thomson* does not expressly state that disgorgement of benefits received under a void contract is automatic. However, *Thomson* gave its imprimatur to a long line of cases applying that remedy, and it approved that remedy against Call. *Thomson* considered a flexible rule, but then decided against it for policy reasons after considering the unacceptable ramifications of such a rule. More recently, *Finnegan* held that a public entity is entitled to recover any compensation it paid under a tainted contract without restoring any of the benefits it received. (*Finnegan, supra,* 91 Cal.App.4th at p. 583.) By logical import, *Finnegan* interpreted *Thomson* as a binding precedent holding that the disgorgement remedy is automatic. For policy reasons, we follow the lead of *Finnegan.* We do so for two reasons. Based on stare decisis, we pay deference to the long history of consistent appellate case law recognized in *Thomson.* Also, as a policy matter, it is the most effective way to give section 1090 all the teeth that it needs.

By focusing on themselves, the Padillas have missed a salient point. The $850,000 paid to them was public money. We have sympathy for their ordeal, and they may be placed in an economic bind by the disgorgement, but their interest must yield to the greater interest of the public.

Our holding sends a message. If a corrupt public official demands an extortion payment in exchange for a public contract, the victim should not pay. Instead, the victim should report the corrupt public official to local, state or federal law enforcement. If the victim pays and the extortion is discovered, the victim will not be permitted to retain any consideration received. The reason is simple. A public contract obtained through an extortion payment is not valid, and no one should believe that it is valid. A bright-line rule is required.

### b. *The remedy is appropriate.*

The Padillas complain that they have been unfairly punished. But this is not a punishment. It is a recovery of public money. Moreover, they are in a better position than Call because he lost both his purchase money and his land. The Padillas are in the same position they were in before; they will be the owners of Camino Senior Village, they will have high debt service and they will need financial assistance from the City of Carson. Nothing stops them from going to the City of Carson to work out a contract that is not tainted by a conflict of interest.

### c. *Judgment was proper.*

In the first cause of action for avoidance of the Buydown Agreement, the Agency alleged that it was "entitled to a return of the $850,000." In its motion for summary judgment or adjudication, it stated, inter alia, that "under state law a public agency that awarded . . . a void contract is entitled to a full disgorgement of any benefits." Once the trial court granted summary adjudication of the first cause of action, the Agency was entitled to recover the $850,000. When the Agency dismissed its second, third and fourth causes of action, nothing else remained to be tried. At that point it was proper for the trial court to enter judgment in favor of the Agency.

The Padillas' contention that judgment was improper is contingent upon their argument that disgorgement was not automatic and that the trial court had to hold a hearing regarding the appropriate remedy. Because disgorgement was automatic, this last and final contention is moot.[6]

---

[6] We need not reach the other issues raised by the parties.

## DISPOSITION

The judgment is affirmed. The Agency shall recover its costs on appeal.

Boren, P. J., and Chavez, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 27, 2006, S145650.