[No. B185391. Second Dist., Div. Six. Dec. 27, 2007.]

COUNTY OF SAN BERNARDINO et al., Plaintiffs and Appellants, v. KENNETH JAMES WALSH et al., Defendants and Appellants.

COUNSEL

Gumport Reitman, Leonard L. Gumport, Peter J. Mastan; Ruth E. Stringer, Acting County Counsel, and Michael A. Sachs, Chief Deputy County Counsel, for Plaintiffs and Appellants.

Law Offices of Randall S. Waier and Randall S. Waier for Defendants and Appellants Harry M. Mays, Bio-Reclamation Technologies, Inc., and Kenneth James Walsh.

William J. Kopeny & Associates and William J. Kopeny for Defendants and Appellants William Shepardson McCook and Oakridge Group Corporation.

OPINION

PERREN, J.—In the 1990's, the citizens of San Bernardino County (County) fell victim to a political corruption scandal involving their county officials. James J. Hlawek, the County's chief administrative officer, and other officials accepted bribes and kickbacks from contractors in return for using their official positions to assist the contractors in obtaining profitable contracts from the County. Several County officials and businessmen were indicted in 1999 on federal bribery charges, and the instant civil action was filed by the County in an effort to recover damages suffered as a result of the bribery.

This appeal covers two of the bribery schemes alleged in the civil action. In one scheme, appellants Harry M. Mays, Kenneth James Walsh, and Bio-Reclamation Technologies, Inc. (Mays/Walsh), bribed Hlawek to obtain approval of a solid waste management contract with the County. In the other scheme, appellants William McCook and Oakridge Group Corporation (McCook/Oakridge) bribed Hlawek to obtain approval of a billboard lease from the County. Hlawek, Mays, and Walsh were convicted of criminal bribery charges, but McCook was acquitted. Except for Hlawek's involvement, the two bribery schemes are factually unrelated.

The County obtained a money judgment against both Mays/Walsh and McCook/Oakridge who filed separate appeals. Both appeals focus on issues of compensatory and punitive damages. Mays/Walsh contend the trial court erred by awarding unjust enrichment damages to the County that required them to disgorge the profits from their bribes. They also contend the punitive damages awards were excessive. Similarly, McCook/Oakridge contend the trial court erred by awarding damages to the County that required them to

disgorge the profits realized by the assignment of the billboard lease to a third party. We conclude that the trial court's remedy on both appeals was supported by the evidence and the law. Accordingly, we affirm the judgment as to Mays/Walsh and McCook/Oakridge.

In addition, the County filed a separate appeal of a pretrial order granting summary adjudication of certain claims against McCook/Oakridge. Because our affirmance of the judgment provides the County the relief it prayed for in its complaint, the County's appeal is moot and we do not consider the issues raised therein.

I

## MAYS/WALSH WASTE MANAGEMENT CONTRACT

### FACTS

The San Bernardino County Administrative Officer (CAO) is the principal administrative officer of the County. The CAO advises the County board of supervisors, recommends specific determinations by the board, sets the board agenda, and administers board decisions. Harry S. Mays served as CAO from 1986 to 1994. James Hlawek succeeded Mays and served as CAO from July 1994 to September 1998. Before Hlawek became CAO, Mays learned that Hlawek had a criminal record arising from prior employment by the IRS. On advice from Mays, Hlawek concealed his criminal record from County officials.

In 1989, Norcal Waste Systems, Inc. (Norcal), entered into a contract to provide waste management services for the County. Walsh, a vice-president of Norcal, was in charge of Norcal's operations. In 1994, Norcal, acting through Walsh, began negotiating a new contract which would increase Norcal's duties and control over the County's waste disposal system, and result in an increase in County annual payments to Norcal from approximately $18 million to more than $40 million.

In September 1994, shortly after his retirement as CAO, Mays entered into a consulting agreement with Norcal to assist Norcal in obtaining County approval of the new waste management contract. In the same month, Mays and Walsh agreed to bribe Hlawek to secure Hlawek's influence on their and Norcal's behalf. In October 1994, Walsh set up Queue Corporation as a conduit for bribes. Mays would transfer money received from Norcal into

Queue and another Walsh company, and those companies would use the money to pay bribes to Hlawek.

After September 1994, Mays/Walsh and Hlawek arranged for further personal financial gain from the new Norcal contract. Mays negotiated a more lucrative consulting agreement with Norcal in January 1995. The revised contract provided that Mays and Bio-Reclamation Technologies, Inc. (Bio), a company controlled by Mays, would receive a $1 million fee when the County approved the Norcal contract, plus additional payments if Norcal revenue was further increased through the issuance of bonds to finance landfill closures. Mays agreed to split Bio's fees 60-40 with Walsh.

During 1995, Hlawek used his authority and influence as chairperson of the County's negotiating committee to obtain County approval of the Norcal contract. Among other things, Hlawek convinced the County to award the contract without competitive bidding. The County approved the Norcal contract on September 12, 1995.

From 1995 to 2000, the County paid Norcal more than $200 million. During the same period, Norcal paid $4.2 million to Mays and Bio under their consulting agreement and Bio, in turn, paid more than $1.1 million to Queue and Walsh's other company. Mays and Walsh made more than $90,000 in bribery payments to Hlawek.

In addition, Hlawek urged the County to give Norcal extra so-called "trust account work" for additional compensation and to do so without competitive bidding. Hlawek also influenced the County to hire Daniel Hernandez Trucking as a subcontractor because Walsh was getting kickbacks from Hernandez which ultimately totaled $210,000.

In April 1996, the County, acting as the Inland Empire Solid Waste Financing Authority, approved a $90 million bond offering to finance the closure of County landfills. Based on a promise of more bribes from Mays/Walsh, Hlawek selected Miller & Schroeder (M&S) as bond under-writer. Mays received $325,000 from M&S and additional compensation from Norcal for his efforts in convincing the board of supervisors to authorize the issuance of bonds.

In mid-1998, federal authorities started a criminal investigation of the bribery scheme. Until then, the County was unaware of any bribery or other misconduct by Mays/Walsh and Hlawek. In late 1998 and 1999, Hlawek, Mays, and Walsh pleaded guilty to conspiracy to commit bribery. In

2000, Walsh and Mays were sentenced to 18- and 24-month prison terms, respectively.

In June 2000, the County filed its civil complaint against Mays/Walsh, Hlawek, M&S, Norcal, and others alleging a variety of claims. Norcal and M&S settled before trial. Norcal's settlement included a $6.5 million payment to the County and cancellation of its contract.

In February 2002, the County filed an amended complaint. After a 22-day bench trial in June and July 2004, the trial court issued a detailed statement of decision ruling that Hlawek and Mays/Walsh were jointly and severally liable for breaching or inducing a breach of Hlawek's fiduciary duty, fraud, unfair competition, and unjust enrichment. On the claims other than unfair competition, the court awarded damages of $4,242,626, comprised of Hlawek's salary, direct bribes by Mays/Walsh to Hlawek, Hernandez kick-backs, and most of Mays's consulting fees from Norcal. After a bifurcated bench trial, the trial court assessed $1 million in punitive damages against Mays, and $500,000 in punitive damages against Walsh on the breach of fiduciary and fraud causes of action.

## DISCUSSION

### *Substantial Evidence Supports Liability*

Mays/Walsh contend that there is no evidence to support liability. They argue that County's approval of the Norcal contract was inevitable when the bribery scheme began, and that the bribery scheme should be disregarded because the contract was a good bargain for the County. We disagree.

We review a challenge to the trial court's factual findings under the substantial evidence test. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461–462 [17 Cal.Rptr.3d 96].) We presume the record contains evidence sufficient to support the judgment, consider the evidence in the light most favorable to the judgment, and resolve all conflicts in favor of the judgment. (*SFPP, supra,* at p. 462.)[1]

---

[1] The County argues that Mays/Walsh forfeited their substantial evidence claim by failing to fairly summarize the evidence. (See *Foreman & Clark Corp., supra,* 3 Cal.3d at p. 881.) We agree that Mays/Walsh focus on evidence favorable to them and make factual assertions unsupported by any evidence, but these distortions do not impair our ability to review their claim on its merits.

Substantial evidence supports the finding that Mays or Walsh began bribing Hlawek before the September 1995 approval of the Norcal contract or any County action that made approval inevitable. Bribery payments by Mays/Walsh started in 1994, Walsh created Queue Corporation to launder bribery money in 1994, and Hlawek's efforts to convince the County to approve the contract also began long before the contract was approved. Plea agreements signed by Mays and Walsh regarding their criminal bribery convictions include factual admissions which permitted, and virtually required, the trial court to make these factual findings. We reject the Mays/Walsh argument that the plea agreements are inadmissible or should be discounted in any manner. (See *Teitelbaum Furs, Inc. v. Dominion Ins. Co.* (1962) 58 Cal.2d 601, 605 [25 Cal.Rptr. 559, 375 P.2d 439]; Evid. Code, § 1220.) There was also testimony by Hlawek, Mays, Walsh, and County officials which support the admissions in the plea agreements and otherwise support the trial court's findings. Additional evidence shows that the bribery scheme continued well into 1998 when bribes were made to increase the scope of work under the Norcal contract.

We also reject the Mays/Walsh argument that the County suffered no damages because the expanded waste disposal contract with Norcal was a good bargain for the County. Apart from agreeing with the County that there is no such thing as harmless bribery or honest graft, there is substantial evidence to support the conclusion that the County lost millions of dollars. Norcal's compensation increased from $18 million per year under the 1989 contract to more than $40 million per year under the 1995 contract and, between 1996 and 2000, the County paid Norcal more than $200 million including over $4 million that ended up in the pockets of Mays/Walsh.

### Damages Properly Based on Unjust Enrichment

■ The essence of the Mays/Walsh position is that the County did not incur any damage from the bribery scheme because the County's money was not used to pay the bribes. Although the evidence shows that the County suffered a monetary loss, the trial court's damage award was not based on a computation of that loss. Instead, the court applied the principle of unjust enrichment to require Mays/Walsh to disgorge the ill-gotten gains they received in the bribery scheme. In substance, Mays/Walsh are contending that the trial court applied an improper theory of damages. We conclude that the evidence and law support the trial court and warrant a damage award based on disgorgement of the amounts by which Mays/Walsh were unjustly enriched.

■ Unjust enrichment is an equitable principle that underlies "various legal doctrines and remedies." (*Dinosaur Development, Inc. v. White* (1989) 216 Cal.App.3d 1310, 1315 [265 Cal.Rptr. 525].) It is based on the idea that "one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly." (*Ibid.*; see also *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 [57 Cal.Rptr.2d 687, 924 P.2d 996]; *Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793 [131 Cal.Rptr.2d 347]; Rest., Restitution, § 1, p. 12.)

■ Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position. (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 198 [98 Cal.Rptr.2d 44]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 627 [12 Cal.Rptr.2d 741].) The principle of unjust enrichment, however, is broader than mere "restoration" of what the plaintiff lost. Many instances of "liability based on unjust enrichment . . . do not involve the restoration of anything the claimant previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained . . . ." (Rest.3d Restitution and Unjust Enrichment (Discussion Draft 2000) § 1, com. c.) "[T]he public policy of this state does not permit one to 'take advantage of his own wrong' " regardless of whether the other party suffers actual damage. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 741–742 [336 P.2d 534].) Where "a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust . . . the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched." (Rest., Restitution, § 1, com. e, p. 14.)

■ " '[I]t is not essential that money be paid directly to the recipient by the party seeking restitution. . . .' " (*Shersher v. Superior Court* (2007) 154 Cal.App.4th 1491, 1500 [65 Cal.Rptr.3d 634], citation omitted; see *Hirsch v. Bank of America* (2003) 107 Cal.App.4th 708, 722 [132 Cal.Rptr.2d 220]; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1278 [90 Cal.Rptr.2d 41].) The emphasis is on the wrongdoer's enrichment, not the victim's loss. In particular, a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. (*Ward v. Taggart, supra,* 51 Cal.2d at pp. 741–742; *State of California v. Levi Strauss & Co.* (1986) 41 Cal.3d 460, 472 [224 Cal.Rptr. 605, 715 P.2d 564].) Disgorgement

may include a restitutionary element, but it " 'may compel a defendant to surrender all money obtained through an unfair business practice . . . regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144–1145 [131 Cal.Rptr.2d 29, 63 P.3d 937].) Without this result, there would be an insufficient deterrent to improper conduct that is more profitable than lawful conduct.

Disgorgement of profits is particularly applicable in cases dealing with breach of a fiduciary duty, and is a logical extension of the principle that public officials and other fiduciaries cannot profit by a breach of their duty. Where a person profits from transactions conducted by him as a fiduciary, the proper measure of damages is full disgorgement of any secret profit made by the fiduciary regardless of whether the principal suffers any damage. (*Ward v. Taggart, supra,* 51 Cal.2d at pp. 741–742; see also Rest., Restitution, § 138; *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 6, 13–15 [60 Cal.Rptr.2d 207] [attorney who "offered to sell out" his clients for money should not receive any amount as an attorney's fee when such action is " ' "inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties" ' "].)

■ Here, Hlawek and Mays were government officials with a fiduciary duty to the County.[2] And, although Walsh was a Norcal official, liability extends both to the holder of the fiduciary duty and to others who are active participants in a breach of such duty. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 464–465 & fn. 14 [80 Cal.Rptr.2d 329]; *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1103–1104 [3 Cal.Rptr.2d 236].) Active participants in the breach of fiduciary duty by another are accountable for all advantages they gained thereby and are liable to the beneficiary of the duty without reference to the amount of the fruits of the fraudulent transaction he personally obtains. (Rest., Restitution, § 138.)

In this case, Mays/Walsh were actively involved in corruption which undermined good government and the proper use of public money for the benefit of the people government serves. The judgment against Mays/Walsh takes back the money they reaped from their personal fraud and dishonesty. It awarded to the County that which was rightfully the County's. This result is both equitable and vindicates a public policy that wrongdoers must give up the money they wrongfully obtain in dealing with the government. Although Norcal wrote the checks to Mays and Bio, Norcal received the money from the County in performing the improperly approved contract. The County

---

[2] Mays was not a government official during the execution of the bribery scheme but remained a fiduciary under County rules.

was the source of the money received by Mays/Walsh and it can fairly be said that the entire bribery scheme was "at the expense" of the County and its residents.

### No Error in Ruling on Setoffs

Mays/Walsh contend that they are entitled to, but did not receive, a setoff against their judgment for amounts paid in settlement by Norcal and other parties. (Code Civ. Proc., § 877.) We disagree, and conclude that the trial court made the setoffs necessary to avoid a double recovery.

■ Code of Civil Procedure section 877, subdivision (a)[3] is designed to provide for equitable sharing of damages, and assure that "a plaintiff will not be enriched unjustly by a double recovery, collecting part of his total claim from one joint tortfeasor and all of his claim from another." (*Reed v. Wilson* (1999) 73 Cal.App.4th 439, 444 [86 Cal.Rptr.2d 510].) We review a ruling granting or denying offsets under the deferential abuse of discretion standard, and conclude there was no abuse of discretion. (*Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1504–1505 [24 Cal.Rptr.2d 156]; *May v. Miller* (1991) 228 Cal.App.3d 404, 411 [278 Cal.Rptr. 341].)

The trial court expressly found that the damage awards against the Mays/Walsh appellants represented their proportionate share of liability, reflected a setoff for the amounts paid in settlement by Norcal, M&S and others, and would not result in any double recovery. In particular, the court found that Norcal received more than $13.2 million in pretax profits. The court set off the $6,562,000 Norcal settlement and the $400,000 M&S settlement against this $13.2 million, leaving total damages well in excess of the judgment against Mays/Walsh. Ignoring the trial court's factual findings, Mays/Walsh essentially argue that the Norcal and M&S settlements constitute the total amount of damages to the County.

### Award of Punitive Damages Proper

Mays/Walsh contend that the evidence of their financial condition is insufficient to support the punitive damages awards. They argue that there

---

[3] The statute provides in pertinent part: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . . , it shall . . . [¶] . . . not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater." (Code Civ. Proc., § 877, subd. (a).)

was no evidence or adequate findings of their financial condition at the time of trial, and that the $1 million and $500,000 awards will financially destroy both men. We disagree.

■ The essential question in determining a punitive damages award is whether the amount of the award substantially serves the societal interest in punishing the wrongdoer and deterring similar misconduct. In answering the question, courts consider (1) the reprehensibility of the defendant's conduct, (2) the relationship between the punitive damage award and the harm done, and (3) the amount of the punitive damage award in proportion to the defendant's wealth. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348]; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928–929 [148 Cal.Rptr. 389, 582 P.2d 980].)

Under California law, we review a trial court's determination of punitive damages under the substantial evidence standard.[4] (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679 [58 Cal.Rptr.3d 686].) We will reverse the trier of fact only if the award is so excessive as to raise a presumption it was the result of passion or prejudice. (*Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at pp. 927–928; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1257–1259 [1 Cal.Rptr.2d 301].) We conclude that the trial court's award of punitive damages is supported by substantial evidence of all three critical factors.

The Mays/Walsh bribery scheme was reprehensible. They bribed a county's CAO. Their criminal conduct did not involve a single act but, rather, a pattern of deceit in a well-formulated and complex scheme that required continuous manipulation of the County over an extended period of time. The misconduct also caused injury that extended beyond the dollar amounts involved. The wrongdoing was political corruption and the injury was to the people of San Bernardino County. Mays/Walsh's attack on fundamental governmental processes undermines public confidence in government, and the ability of the County to serve its residents.

The Mays/Walsh argument, however, focuses on the claim that Mays and Walsh lack the financial resources to pay any punitive damage award. As they argue, a punitive damage award that is reasonable in light of the reprehensibility and injury factors may "be so disproportionate to the defendant's ability to pay that the award is excessive." (*Adams v. Murakami, supra*, 54 Cal.3d at p. 111.) An award cannot exceed the level necessary " 'to properly punish

---

[4] Mays/Walsh appellants do not challenge the constitutionality of the award, which would require a de novo review. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 [29 Cal.Rptr.3d 379, 113 P.3d 63].)

and deter.' " (*Id.* at p. 110, quoting *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.)

■ Moreover, a defendant's ability to pay a punitive damage award must be based on meaningful and substantial evidence of his or her financial condition. (*Adams v. Murakami, supra,* 54 Cal.3d at pp. 110–111; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064–1065 [16 Cal.Rptr.2d 811].) A defendant's "net worth" is the critical determinant of financial condition, but there is no rigid formula and other factors may be dispositive especially when net worth is manipulated and fails to reflect actual wealth. (See *Adams,* at p. 109; *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, 57 [19 Cal.Rptr.2d 771].) The purpose of punitive damages "is not served by financially destroying a defendant. The purpose is to deter, not to destroy." (*Adams,* at p. 112.) In all cases, the plaintiff has the burden of proving the financial condition of the defendant. (*Adams,* at pp. 119–123.)

Here, the trial court found that both Mays and Walsh had "systematically and deceitfully manipulated and concealed [their] ill-gotten gains and [their] net worth," and "provided knowingly false testimony" at trial concerning the extent of the wealth they obtained from the bribery scheme. Despite some success in this concealment, substantial evidence supports the trial court's conclusion that the punitive damage awards will not financially destroy either Mays or Walsh and that they retain sufficient exempt or judgment-proof assets to live comfortably despite the awards.

The court found that, since 1998, Mays manipulated a net worth of $3.7 million to ensure that he would retain a comfortable lifestyle regardless of any judgment in this case. The court also found that Walsh had manipulated his assets which exceeded $2 million. Specifically, based on unchallenged evidence offered by the County, Mays had hidden at least $3.7 million by opening an offshore "asset protection" account in the Cayman Islands in 1998, and had deposited $600,000 into a private retirement plan. There is also evidence that he bought a residence in Nevada for $249,000, paid a $200,000 down payment on another house on Lee Court in Carlsbad, transferred $340,000 to his spouse in their 2000 divorce while continuing to live with her, and gave his former wife their residence which was then sold for $825,000. The court found that Mays retained use of the assets transferred to his wife after their stipulated divorce.

The trial court found that Walsh had transferred two investment properties to his wife, he was working for his wife as an employee at the time of trial, and that, as of May 2004, Walsh and his wife owned more than $2 million in

assets as well as equity in real property of $369,000. The court also found that Walsh retained use of the assets transferred to his wife.

The court also found that Mays receives approximately $7,600 in monthly public retirement benefits which is exempt from execution by creditors (Code Civ. Proc., § 704.110) and $3,800 in monthly and partially exempt private retirement benefits. (Code Civ. Proc., § 704.115.) The court found that Walsh had a $388,942 interest in an exempt private retirement plan as of September 2003.

Mays/Walsh do not contest the trial court's specific factual findings on appeal except to challenge their sufficiency. In addition, they failed to offer any evidence of their financial condition at trial except for vague and evasive assertions that they had no assets at all. As a result, the trial court's findings were and are essentially uncontested.

■ As stated by the trial court, "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto . . . ." (Evid. Code, § 413.) Mays and Walsh intentionally concealed their assets, testified falsely regarding many factual issues, and were, at best, evasive and nonresponsive in answering questions as to their financial condition. This conduct gave the court wide latitude to make inferences from the evidence unfavorable to Mays and Walsh. (See *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 609 [92 Cal.Rptr.2d 897]; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1537 [51 Cal.Rptr.2d 311].)

In addition, the amount of punitive damages is not out of proportion to the compensatory damages and bears a reasonable relationship to the harm suffered by the County. (See, e.g., *Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1163 [85 Cal.Rptr.2d 726]; *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1057 [135 Cal.Rptr.2d 736].) And the trial court could have, but did not, assess prejudgment interest which would have exceeded the amount of punitive damages.

II

McCOOK/OAKRIDGE BILLBOARD LEASE

FACTS

The San Bernardino County Flood Control District is a County agency governed by the County Board of Supervisors. Its director reports to a County

official who, in turn, reports to the CAO who, at all relevant times, was Hlawek. Oakridge Group Corporation is a corporation owned and controlled by William S. McCook.

In November 1994, the County Board of Supervisors approved a five-year lease to McCook/Oakridge of billboard sites along certain County highway rights-of-way. The lease required McCook/Oakridge to complete construction of billboards on the sites within the initial 12 months of the lease term. The lease also required County approval of any assignment of the lease.

McCook/Oakridge failed to obtain the permits required for construction of the billboards during the required 12-month period and two extensions granted by the County. To facilitate County approval of the extensions, McCook/Oakridge provided Hlawek and other County officials free lodging and food and beverages at a Las Vegas casino.

In June 1996, the County gave McCook/Oakridge a third extension to construct the billboards. McCook/Oakridge continued to have difficulty in completing their permit and construction obligations, and paid a $15,000 bribe to Hlawek to use his influence to expedite the permit and construction process. Hlawek did so and seven billboards had been completed by April 1997 at a cost to McCook/Oakridge of $600,000.

In May 1997, McCook/Oakridge agreed to assign the lease and sell five of the seven billboards to Eller Media for a payment of $4.4 million. The agreement was subject to McCook/Oakridge obtaining County consent to the assignment and a letter from the County stating that there were no defaults under the lease.

When McCook/Oakridge had difficulty obtaining the consent and no-default letter, the assignment and sale to Eller Media was placed in jeopardy. Again, McCook/Oakridge obtained Hlawek's assistance. In return for a $20,000 bribe, Hlawek expedited the issuance of the County's consent and issuance of a no-default letter. The consent and letter were reluctantly issued by the County Board of Supervisors after Hlawek convinced board members that there was no reasonable basis to withhold consent. McCook/Oakridge received a $4.4 million payment from Eller Media in June 1997. Subtracting the $600,000 cost of erecting the billboards, McCook/Oakridge's profit was $3.7 million. The County discovered the bribery scheme involving McCook/Oakridge and Hlawek shortly before the County filed its complaint in June 2000.

In its second amended complaint, the County alleges causes of action against the McCook/Oakridge lease for violation of Government Code section 1090 (section 1090) and certain other statutes, breach of fiduciary duty, fraud, breach of lease, unfair competition, and unjust enrichment. In May 2002, the trial court granted a motion for summary adjudication in favor of McCook/Oakridge on the claims for breach of fiduciary duty, fraud, unfair competition, and unjust enrichment. The remaining claims were tried with the claims arising out of the Norcal contract.

After trial, the trial court ruled that McCook/Oakridge were liable to the County for violation of section 1090[5] and breach of the lease based on their bribery of Hlawek. The court also ruled that McCook/Oakridge had under-paid rent. On the statutory claim, the trial court awarded the County $3.8 million in damages representing the proceeds of the lease assignment to Eller Media, less the cost of erecting the billboards.

## DISCUSSION

### *McCook/Oakridge Profit Recoverable for Violation of Section 1090*

McCook/Oakridge concede that Hlawek had a prohibited financial interest in the lease and its assignment to Eller Media, and do not challenge the trial court's finding of a violation of section 1090 or the County's right to recover restitution damages. They contend, however, that section 1090 limits restitution damages to the County's direct financial loss, and does not permit recovery of the payment by Eller Media to McCook/Oakridge for the assignment. We disagree. We conclude, for reasons similar to our analysis of the unjust enrichment recovery against Mays/Walsh, that the trial court properly required McCook/Oakridge to disgorge the profits they received from Eller Media. In order to fulfill the fundamental public policy underlying section 1090, the County may obtain a forfeiture of the proceeds of a tainted contract, even when the proceeds were received from a third party rather than the public entity itself.

 Section 1090 prohibits public officials from being financially interested in any contract made by them in their official capacity. (*Carson*

---

[5] Section 1090 provides in relevant part that: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity." (Gov. Code, § 1090.)

*Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1329–1330 [44 Cal.Rptr.3d 881].) Section 1090 embodies the principle that the duties of public office demand the absolute loyalty and undivided allegiance of the individual who holds the office. (*Thomson v. Call* (1985) 38 Cal.3d 633, 648 [214 Cal.Rptr. 139, 699 P.2d 316]; *People v. Honig* (1996) 48 Cal.App.4th 289, 314 [55 Cal.Rptr.2d 555].) More basically, section 1090 applies "[t]he truism that a person cannot serve two masters simultaneously." (*Thomson*, at p. 637; see *Honig*, at pp. 313–314.)

Section 1090 has been interpreted liberally to prohibit any form of self-dealing. (See *Thomson v. Call, supra*, 38 Cal.3d at pp. 647–648; *People v. Honig, supra*, 48 Cal.App.4th at p. 314.) The statute cannot be given "a narrow and technical interpretation that would limit [its] scope and defeat the legislative purpose." (*Honig*, at p. 314; see also *Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289].) Section 1090 is triggered when a public official receives any profit from a public contract and includes the acceptance of a bribe in return for influencing the public entity to enter into a particular contract. (See *People v. Vallerga* (1977) 67 Cal.App.3d 847, 867 [136 Cal.Rptr. 429]; *Terry v. Bender* (1956) 143 Cal.App.2d 198, 203–204, 207–208 [300 P.2d 119].)

More critically to this appeal, courts also have liberally interpreted the remedies available for a violation of section 1090 to permit the public entity to recover compensation without restoring the benefits it received under the contract. (*Thomson v. Call, supra*, 38 Cal.3d at p. 647; *Carson Redevelopment Agency v. Padilla, supra*, 140 Cal.App.4th at p. 1331.) Because contracts in violation of section 1090 are against fundamental public policy, parties who participate in the unlawful making of the contract should forfeit all interest flowing from the contract to avoid the prospect of unjust enrichment. (*Thomson*, at p. 647; *Carson*, at p. 1331.) An actual loss to the public entity is not necessary. (*Thomson*, at p. 648; *Carson*, at p. 1330.)

We acknowledge, as McCook/Oakridge argue at length, that no published case has held that a public entity is entitled to damages representing the price paid by a third party as consideration for the transfer of the benefits under a contract in violation of section 1090.

We conclude, however, that under the circumstances of this case, an award of damages representing the price paid by a third party to obtain benefits under a contract that violates section 1090 is warranted. Such a remedy is consistent with the purpose of section 1090 to prevent an offending party from benefiting from a contract that involves self-dealing by a public official.

(See *Carson Redevelopment Agency v. Padilla, supra,* 140 Cal.App.4th at pp. 1335–1336.) As with the principle of unjust enrichment, section 1090 focuses on the wrongdoer rather than the victim. Disgorgement of profits is a logical extension of the rationale of section 1090 that public officials cannot profit by a breach of their duty or take advantage of their own wrongdoing.

In *Thomson,* the Supreme Court stated that the facts of that case "represent but one of endless permutations generated by the basic conflict-of-interest situation, and a different remedy could be tailored for each." (*Thomson v. Call, supra,* 38 Cal.3d at p. 652.) The court emphasized that there must be a policy of strict enforcement to create "a strong disincentive for those officers who might be tempted to take personal advantage of their public offices." (*Ibid.*)

In *Thomson,* Call, a member of the city council, sold a parcel of land to a developer who was engaged in negotiations with the city regarding another parcel of land. Later, the developer resold Call's land to the city for use as a park after Call disclosed his involvement in the sale to the developer. Despite acknowledging that Call did not commit fraud, conspire to violate section 1090, or withhold any facts from the city, the court ordered the forfeiture of the land and money received from its sale. (*Thomson v. Call, supra,* 38 Cal.3d at p. 647.)

Unlike Call, who was aboveboard in his dealings with his municipality, McCook/Oakridge profited from buying Hlawek. There was actual and overt corruption and dishonesty that, by its nature, justifies a harsher remedy. McCook/Oakridge were able to obtain and then sell by way of assignment a valuable asset that they obtained from the County through a pattern of self-dealing by Hlawek and bribes paid by McCook/Oakridge.

This is not a situation where the County bought something and could be made whole by a judgment requiring defendant to return the money paid by the County. Under the facts of the instant case, the goal of the statute cannot be achieved with a lesser remedy that would provide no disincentive to the misconduct. As the trial court stated, the absence of a judgment requiring McCook/Oakridge to disgorge the profits it received from Eller Media would leave "a powerful incentive to pay small bribes for big public contracts."

The only remedy that would redress the injury to the people of the County is to unravel the deceit and require McCook/Oakridge to pay the County the profit from their and Hlawek's misdeeds. (See *Carson Redevelopment Agency v. Padilla, supra,* 140 Cal.App.4th at pp. 1335–1336.) The remedy fashioned by the trial court is an equitable form of forfeiture that is utilitarian

in its design and serves the community by strongly discouraging the avarice of corrupt politicians and the burden of contracts tainted by conflicts of interest. (See *id.* at p. 1331.) The damages may reflect money paid by Eller Media and not from the County treasury, but the County's residents were harmed by the corruption and self-dealing and, in a broader sense, the lease and lease assignment were made "at the expense" of those residents.

Furthermore there are no mitigating factors that might make disgorgement of the money McCook/Oakridge received from Eller Media unfair. In *Thomson,* the Supreme Court concluded that section 1090 is not limited to situations were there is fraud or dishonesty but, nevertheless, was concerned with the harshness of the restitution remedy in the absence of fraud or intentional wrongdoing in that case. (See *Thomson v. Call, supra,* 38 Cal.3d at pp. 648, 650–652; see also *Carson Redevelopment Agency v. Padilla, supra,* 140 Cal.App.4th at p. 1336.) In the instant case, the fraud and dishonesty of McCook/Oakridge is of the kind which section 1090 addresses.

McCook/Oakridge also contend that there was no evidence that $3.7 million represented the actual accounting profit to McCook/Oakridge from the assignment of the lease. We reject this contention. There was evidence that Eller Media paid $4.4 million for the assignment and sale of the billboards and that the cost of erecting the billboards was $600,000. There was no error by the trial court in computing the ill-gotten gains of McCook/Oakridge for purposes of assessing damages, even if accountants might reach a different figure for other purposes.

### No Error in Damages for Underpayment of Rent

The trial court found McCook/Oakridge liable for breach of the lease in the form of underpaying rent in the amount of $20,238. McCook/Oakridge contend that this determination is not supported by substantial evidence. We disagree. There was disputed evidence concerning whether, and in what amount, the rent was underpaid. But the testimony of the County's expert and an Oakridge bookkeeper provide substantial evidence to support the trial court's determination.

## DISPOSITION

We affirm the judgment. Costs are awarded to appellants County of San Bernardino, San Bernardino County Flood Control District, and Inland Empire Solid Waste Financing Authority.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied January 25, 2008, and on January 25, 2008, and January 28, 2008, the opinion was modified to read as printed above. The petitions of defendants and appellants for review by the Supreme Court were denied April 9, 2008, S160625.