Filed 2/24/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SWEETWATER UNION SCHOOL DISTRICT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GILBANE BUILDING COMPANY et al., <br><br> Defendants and Appellants. | D067383 <br><br><br> (Super. Ct. No. 37-2014-00025070-CU-MC-CTL) |

APPEAL from an order of the Superior Court of San Diego County,

Eddie C. Sturgeon, Judge.  Affirmed.

Denton US, Charles A. Bird, Christian D. Humphreys and Gary K. Brucker, Jr. for

Defendants and Appellants.

Schwartz Semerdjian Cauley & Moot, John S. Moot and Sarah B. Evans for

Plaintiff and Respondent.

I.

INTRODUCTION

Plaintiff Sweetwater Union High School District (Sweetwater) filed this action against defendants Gilbane Building Company (Gilbane), The Seville Group, Inc. (SGI), and Gilbane/SGI, a joint venture (the Joint Venture), seeking to void management contracts with all three entities, and to require that they disgorge all sums that Sweetwater paid them under the contracts, pursuant to Government Code section 1090 (Section 1090).[1] Sweetwater alleges that certain representatives of the defendant entities engaged

---

[1]     Section 1090 provides:

> "(a) Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity.

> "(b) An individual shall not aid or abet a Member of the Legislature or a state, county, district, judicial district, or city officer or employee in violating subdivision (a).

> "(c) As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

Government Code section 1092, subdivision (a) authorizes the voiding of a contract that was entered into in violation of section 1090:

> "(a) Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein. No such contract may be avoided because of the interest of an officer therein unless the contract is made in the official capacity of the officer, or by a board or body of which he or she is a member."

2

in a "pay to play" scheme with several Sweetwater officials that involved paying for expensive dinners, tickets to entertainment and sporting events, and travel expenses, and making contributions to political campaigns and charities, in an effort to influence the officials to award defendants certain construction contracts.

Gilbane and the Joint Venture (jointly, defendants) brought a special motion to strike (or "anti-SLAPP motion") under Code of Civil Procedure section 425.16 (the SLAPP Act).[2] The trial court denied the motion on the ground that the conduct underlying the complaint was illegal as a matter of law, and therefore, was not protected by the constitutional guarantees of free speech and petition.

Defendants contend that the trial court erred in denying their anti-SLAPP motion. Defendants assert that Sweetwater's complaint is based on actions that are protected under the First Amendment, and that Sweetwater failed to proffer *admissible* evidence demonstrating that the conduct at issue was illegal, as a matter of law, such that it is not protected by the First Amendment. Defendants further contend that Sweetwater proffered no admissible evidence to demonstrate that it has a probability of prevailing on the merits of the case. Defendants maintain that this court must reverse the trial court's order and remand the case with directions that the trial court grant their anti-SLAPP motion.

We conclude that the trial court did not abuse its discretion in considering the evidence proffered by Sweetwater, including signed plea forms and transcripts from

---

[2]     "SLAPP" refers to a "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 (*Equilon*).)

3

grand jury testimony in criminal cases against many of the individuals involved in the alleged "pay to play" contracting scheme. Such evidence is, in all material respects, indistinguishable from evidence presented by way of a declaration. Based on the proffered evidence, we conclude that Sweetwater has sufficiently demonstrated a probability of prevailing on the merits. We therefore affirm the trial court's denial of defendants' anti-SLAPP motion.[3]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2006, voters in the Sweetwater Union School District approved Proposition O, which authorized up to $644 million in bond sales, the proceeds of which were to be used to renovate and build schools. Sweetwater requested proposals from contractors to manage construction of the Proposition O projects. Although the request for proposal that a Sweetwater official prepared for use in soliciting vendor proposals initially included a "no contact" clause prohibiting bidders and Sweetwater officials from having any contact with each other during the bidding process, Dr. Jesus Gandara, Sweetwater's then superintendent, had the "no contact" clause removed from the request for proposal.

Sweetwater received seven timely proposals, including one from the Joint Venture. Sweetwater appointed a screening committee to review the proposals.

---

[3]    As we discuss below, although we disagree with the trial court's reasoning as to why defendants' anti-SLAPP motion should be denied, we conclude that the result is correct on a different ground.

4

Members of the screening committee included Ramon Leyba, chief operating officer; Katy Wright, director of planning; and Iva Butler, facilities accounting supervisor. The screening panel determined that all seven proposals met Sweetwater's requirements.

Sweetwater then appointed an interview committee, consisting of Leyba; Dianne Russo, chief financial officer; Wes Braddock, a high school principal; Aerobel Banuelos, outside counsel; and Lou Smith, an outside consultant. The interview committee interviewed teams sent by all seven bidders and rated them against a common set of requirements. The interview committee narrowed the field to three finalists, one of which was the Joint Venture.

Sweetwater appointed a final review committee, consisting of Gandara, Leyba, Banuelos, and Ralph Munoz, the "capit[a]l project manager." The committee determined that the Joint Venture was the "top applicant." On this basis, Gandara requested that the Sweetwater School Board (Board) grant him authority to negotiate a contract with the Joint Venture.

In May 2007, the Board approved an "Interim Program Management Agreement" that contained the terms pursuant to which the Joint Venture would provide management for Proposition O projects. Trustees Pearl Quinones, Arlie Ricasa, and Greg Sandoval participated in the approval of this agreement. That same month, Sweetwater contracted for the Joint Venture to take over and complete management services on projects that had

5

been funded through a separate initiative, Proposition BB.[4] Quinones, Ricasa, and Sandoval participated in this decision.

In January 2008, the Board approved the "Program Management Agreement for Proposition 'O' Modernization Program and Other Facilities Master Plan Services," which would govern the Joint Venture's provision of services for the Proposition O work. Quinones, Ricasa, and Sandoval also participated in this decision.[5]

Sometime later, a criminal investigation was launched into the relationships between certain Sweetwater officials and representatives of Gilbane, SGI, and the Joint Venture. The investigation ultimately led to the filing of criminal charges against Henry Amigable, who was Gilbane's Program Director during the relevant period; Rene Flores, the Chief Executive Officer of SGI during the relevant period; and Sweetwater officials Gandara, Sandoval, Quinones, and Ricasa, among others. The charges filed against these individuals involved allegations that Amigable and Flores had bribed Sweetwater officials with gifts, such as expensive dinners, tickets to entertainment and sporting events, payment of travel expenses, and contributions to political campaigns and charities, in an attempt to win the construction management contracts at issue. The charges included allegations of violations of various provisions of the Education Code,

---

4    Management services on these projects were being performed by a different contractor. Evidence presented by Sweetwater demonstrated that the prior contractor had been performing satisfactorily at the time Sweetwater decided to have the Joint Venture take over management services for projects that were already under way pursuant to Proposition BB.

5    Sweetwater and the Joint Venture amended the agreement in May 2008. Quinones, Ricasa, and Sandoval participated in this decision as well.

Government Code, and Penal Code. Many of the individuals who were prosecuted in relation to the alleged bribery scheme ultimately entered pleas of guilty or no contest to at least one criminal offense.

Sweetwater filed this action, seeking to void three contracts with Gilbane, the Joint Venture, and/or SGI, pursuant to Section 1090. Sweetwater alleged that defendants' employees had provided Gandara, Quinones, Ricasa and Sandoval with lavish dinners, trips, and other gifts in order to induce those officials to vote to award the contracts to defendants. Specifically, the complaint alleged that representatives of defendants provided the following "financial inducements" to these public officials, as well as to their family and friends: (1) "Numerous dinners at expensive restaurants," (2) "Tickets to the theater and sporting events, including Charger games and to see The Jersey Boys," (3) "Hotel accommodations, food, and tickets to the Rose Bowl in Pasadena," (4) "Airfare, hotel accommodations, wine tasting, and a hot air balloon ride in Napa Valley," and (5) "Monetary contributions to beauty pageants, charities, and campaigns on behalf of District officials." The complaint further alleged that the named Sweetwater Board members and representatives of defendants had pled guilty to various felony and/or misdemeanor offenses, and set forth the factual basis for each individual's plea.

In response to Sweetwater's complaint, Gilbane filed an anti-SLAPP motion, seeking to strike the first and second causes of action.[6] The Joint Venture joined in the

---

6 The first two causes of action were alleged against all three defendants. The third cause of action was alleged only against SGI.

motion.[7] Gilbane and the Joint Venture argued that Sweetwater's causes of action against them arose from defendants' rights of free expression and petition. Specifically, Gilbane and the Joint Venture maintained that the allegations rested on claims that employees of defendants had made political contributions, charitable donations, and provided gifts to political officials, and that this conduct constitutes political expression and petitioning, which is protected by the First Amendment. Gilbane and the Joint Venture further argued that Sweetwater could not proffer admissible evidence to demonstrate a probability of prevailing on its causes of action against them.

In response to the anti-SLAPP motion, Sweetwater relied on statements included in documents from the criminal cases filed against Amigable, Flores, and former Sweetwater officials Gandara, Quinones, Ricasa, and Sandoval, including written narratives that were incorporated into these individuals' plea forms as the factual bases of their pleas, as well as testimony and documents from grand jury proceedings.[8]

---

[7]     It appears from the record that SGI did not join in the anti-SLAPP motion.

[8]     Sweetwater requested that the trial court take judicial notice of a "Separate Statement in Support of its Motion for Summary Judgment," which it lodged, and two other documents, a "Separate Statement in Support of its Motion for Summary Adjudication as to the Third Cause of Action as to the Seville Group (SGI)," and "Sweetwater Union High School District's Notice of Lodgment in Support of its Motion for Summary Judgment," which were not lodged because the documents were on file in the register of actions in the case. The "Separate Statement in Support of [Sweetwater's] Motion for Summary Judgment" in turn relied on the plea agreements, the narratives supporting the plea agreements, and the grand jury materials.

In addition, Gilbane and the Joint Venture separately requested judicial notice of the existence of the criminal charges against, and the plea forms reflecting the guilty or no contest pleas entered by, Amigable, Flores, Quinones, Ricasa, Gandara and Sandoval, which Sweetwater had incorporated into its complaint, noting that these documents were judicially noticeable as state court records.

Defendants objected to virtually all of Sweetwater's evidence, arguing that the evidence was not properly authenticated and that much of it was inadmissible hearsay.

The trial court denied defendants' anti-SLAPP motion, concluding:

> "Here the anti-SLAPP statute does not apply. The conduct that Defendant's [*sic*] employees are accused of is payment in the form of gifts that were made with the intent to influence the Board's decisions in granting construction contracts from Sweetwater Union High School District to the defendant firms. This conduct, which forms the basis for the underlying civil claims by the District, is shown to be unlawful by the change of plea forms in the related criminal matters."

After denying the anti-SLAPP motion, the trial court ruled on defendants' evidentiary objections. The court sustained eleven of defendants' objections to Sweetwater's evidence, and overruled the remainder.[9]

Defendants filed a timely notice of appeal from the order denying their anti-SLAPP motion.

---

[9] Six of the eleven objections sustained pertained to evidentiary items involving "illegible receipts." Two of the sustained objections involved "[i]mproper opinion" evidence in the form of statements made in declarations regarding the propriety of removing the "no contact" provision in the request for proposal issued by Sweetwater. One sustained foundational objection was to an "[u]nlabeled account statement excerpt." Another sustained foundational objection was to a statement in a declaration regarding one individual's "observation" that the Joint Venture would "often bypass the professional planning staff" in favor of reporting to Gandara. Finally, the court also sustained a foundational objection to a statement in the declaration of Leyba regarding the fact that an "initial panel" had ranked Harris first and the Joint Venture second, but that Gandara subsequently decided that a different panel, on which he would sit, should interview the final three firms and make the final decision.

III.

DISCUSSION

A.     *Anti-SLAPP motion standards*

Code of Civil Procedure[10] section 425.16 establishes a procedure for striking a pleading that is brought primarily to "chill" the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances.  (*Kibler v. Northern Inyo County Local Hospital Dist*. (2006) 39 Cal.4th 192, 197.)  A lawsuit arising from constitutionally protected speech or petitioning activity is a SLAPP if it "lacks even minimal merit."  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)

SLAPP suits may be disposed of summarily by a special motion to strike under section 425.16, commonly known as an "anti-SLAPP motion," which is "a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation."  (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)  Specifically, section 425.16 provides in pertinent part:

> "A cause of action against a person arising from any act of that
> person in furtherance of the person's right of petition or free speech
> under the United States Constitution or the California Constitution in
> connection with a public issue shall be subject to a special motion to
> strike, unless the court determines that the plaintiff has established
> that there is a probability that the plaintiff will prevail on the claim."
> (§ 425.16, subd. (b)(1).)

Resolution of a special motion to strike "requires the court to engage in a two-step process.  First, the court decides whether the defendant has made a threshold showing

---

10     Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

10

that the challenged cause of action is one arising from protected activity.  The moving

defendant's burden is to demonstrate that the act or acts of which the plaintiff complains

were taken 'in furtherance of the [defendant]'s right of petition or free speech under the

United States or California Constitution in connection with a public issue,' as defined in

the statute.  [Citation.]  If the court finds such a showing has been made, it then

determines whether the plaintiff has demonstrated a probability of prevailing on the

claim."  (*Equilon*, *supra*, 29 Cal.4th at p. 67.)  " 'Only a cause of action that satisfies *both*

prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning

*and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' "

(*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278-279 (*Soukup*).)

For purposes of both prongs of an anti-SLAPP motion, "[t]he court considers the

pleadings and evidence submitted by both sides, but does not weigh credibility or

compare the weight of the evidence.  Rather, the court's responsibility is to accept as true

the evidence favorable to the plaintiff . . . ."  (*HMS Capital, Inc. v. Lawyers Title Co.*

(2004) 118 Cal.App.4th 204, 212.)

With respect to the first prong, section 425.16, subdivision (e) specifies the type of

activity that is protected by the anti-SLAPP statute:

> "As used in this section, 'act in furtherance of a person's right of
> petition or free speech under the United States or California
> Constitution in connection with a public issue' includes:  (1) any
> written or oral statement or writing made before a legislative,
> executive, or judicial proceeding, or any other official proceeding

11

authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

"In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity. [Citations.] [¶] In deciding whether the initial 'arising from' requirement is met, a court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b).)" (*Navellier*, *supra*, 29 Cal.4th at p. 89.)

However, "section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 317 (*Flatley*).) Therefore, "where a defendant brings a motion to strike under section 425.16 based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action."

12

(*Id.* at p. 320.)[11]  For these purposes, "illegal" means criminal in nature, and not simply in violation of a statute.  (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654.)

With respect to the second prong in the special motion to strike analysis, "in order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." '  [Citations.]  'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' "  (*Navellier*, *supra*, 29 Cal.4th at pp. 88-89.)  "The second prong . . . is considered under a standard similar to that employed in determining nonsuit, directed verdict or summary judgment motions."  (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672-673.)  A plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP."  (*Soukup*, *supra*, 39 Cal.4th at p. 291.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo.  [Citation.]  [Like the trial court, we] consider 'the pleadings, and supporting and

---

11     The *Flatley* court emphasized that whether a defendant's underlying conduct is illegal as a matter of law is to be determined in relation to the first prong of the SLAPP analysis, and not the second:  "[T]he question of whether the defendant's underlying conduct was illegal as a matter of law is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing, and the showing required to establish conduct illegal as a matter of law—either through defendant's concession or by uncontroverted and conclusive evidence—is not the same showing as the plaintiff's second prong showing of probability of prevailing."  (*Flatley*, *supra*, 39 Cal.4th at p. 320.)

13

opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' " (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3.) Further, "[i]f the trial court's decision is correct on any theory, we must affirm the [anti-SLAPP] order." (*San Diegans for Open Government v. Har Construction, Inc*. (2015) 240 Cal.App.4th 611, 622.)

B.    *Evidentiary issues*

Defendants contend that the trial court abused its discretion in admitting all of the evidence that Sweetwater proffered in opposition to the anti-SLAPP motion. Specifically, defendants assert that the trial court erred in considering (1) the plea forms detailing the guilty and/or no contest pleas of various Sweetwater officials and employees in their criminal cases, (2) evidence from the plea narratives supporting the pleas, (3) evidence in the form of the grand jury testimony of certain individuals related to the criminal proceedings, and (4) evidence in the form of documents presented to the grand jury in connection with the criminal proceedings.

The "proof" presented by the parties in a SLAPP motion "must be made upon competent admissible evidence." (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017.) As a result, "[r]ulings on the evidentiary objections are necessary before the trial court or this court can determine whether [the plaintiff] has presented admissible evidence that demonstrates a probability of prevailing on the merits of her claims." (*Hall v. Time*

14

*Warner, Inc*. (2007) 153 Cal.App.4th 1337, 1347-1348 (*Hall*).) " 'Generally, a party cannot simply rely on the allegations in its own pleadings, even if verified, to make the evidentiary showing required in the summary judgment context or similar motions . . . . The same rule applies to motions under [the anti-SLAPP statute].  Here, like motions under [the summary judgment statute], the pleadings merely frame the issues to be decided.  Similarly, an averment on information and belief is inadmissible at trial, and thus cannot show a probability of prevailing on the claim. . . .  "An assessment of the probability of prevailing on the claim looks to trial, and the evidence that will be presented at that time. . . ." ' "  (*Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 236.)

Because defendants challenge the trial court's rulings with respect to the evidence proffered by Sweetwater in opposition to defendants' anti-SLAPP motion, we address the evidentiary issues before considering defendants' contentions that the trial court erred in denying their anti-SLAPP motion.

1.      *Evidentiary standards*

On appeal, we "review a ruling on an evidentiary objection in connection with a special motion to strike for abuse of discretion."  (*Hall*, *supra*, 153 Cal.App.4th at p. 1348, fn. 3.)  However, as with all reviews of discretionary determinations, the trial court abuses its discretion if it rests its ruling on an error of law.  (See, e.g., *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175-1176; *People v. Eubanks* (1996) 14 Cal.4th 580, 595 ["The discretion of a trial court is, of course, ' "subject to the limitations of legal

principles governing the subject of its action" ' "); *People v. Neely* (1999) 70 Cal.App.4th 767, 775-776 ["The trial court does not have discretion to depart from legal standards"].)

### 2. *Application*

There are, generally, four types of evidence that defendants contend the trial court erred in considering in opposition to their anti-SLAPP motion. Defendants argue that the plea forms detailing the guilty and no contest pleas entered by individuals who were criminally prosecuted in connection with the Sweetwater contracts, as well as the factual narratives supporting those pleas, certain grand jury testimony, and documents presented to the grand jury, all constitute inadmissible hearsay, in that all of this evidence comprises out of court statements being offered for their truth. However, the law clearly permits courts to consider evidence presented in hearsay form for purposes of deciding pretrial motions, as long as that evidence is not otherwise barred by another substantive rule of evidence.[12] We therefore conclude that to the extent that Sweetwater proffered evidence that meets the material requirements of a declaration or affidavit that could be presented in opposition to defendants' anti-SLAPP motions, the trial court could consider

---

[12] Declarations and/or affidavits are clearly admissible for purposes of pretrial motions such as summary judgment motions and anti-SLAPP motions. (See §§ 2009, 473c, subd. (b)(1) ["The motion [for summary judgment] shall be supported by affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken"], 425.16, subd. (b)(2) [court is to consider "the pleadings, and *supporting and opposing affidavits* stating the facts upon which the liability or defense is based" for purposes of an anti-SLAPP motion (italics added)].) Thus, courts may receive and consider hearsay—i.e., out of court statements presented for their truth—for purposes of motion practice, as long as the statements do not contain second level hearsay or evidence that is otherwise irrelevant, not competent or substantively barred under other evidentiary rules.

16

this evidence in the same manner that it would consider evidence proffered by a party by way of a declaration or affidavit. We now turn to the question whether the trial court erred in considering the evidence that Sweetwater proffered in opposition to defendants' anti-SLAPP motion.

Amigable pled either no contest or guilty[13] to a violation of Education Code section 35230 in March 2012.[14] Flores pled no contest to one count of aiding in a misdemeanor, a violation of Penal Code section 659, the misdemeanor being a violation of Government Code section 87203, in April 2012.[15]

---

[13] The plea form does not include, in the space provided for such a designation, a statement as to whether Amigable's plea was "no contest" or "guilty." The parties disagree as to whether Amigable pled "guilty" or "no contest." Defendants argue that any ambiguity should be resolved in favor of concluding that the plea was "no contest," based on the minute order, which refers to a "no contest" plea, and the "whole record," despite acknowledging that Amigable's testimony at the change of plea hearing suggested that he intended to plead "guilty." We conclude that the transcript of the plea hearing establishes that Amigable pled "guilty." The trial court asked, "Mr. Amigable, my understanding is that you are going to be pleading guilty today to a violation of Education Code section 35230, which is a misdemeanor filed in the amended complaint in count 17; is that right?" Amigable responded, "Yes, Your Honor, it is."

[14] Education Code section 35230 provides: "The offering of any valuable thing to any member of the governing board of any school district, with the intent to influence his action in regard to the granting of any teacher's certificate, the appointment of any teacher, superintendent, or other officer or employee, the adoption of any textbook, or the making of any contract to which the board of which he is a member is a party, or the acceptance by any member of the governing board of any valuable thing, with corrupt intent, is a misdemeanor."

[15] Government Code section 87203 provides: "Every person who holds an office specified in Section 87200 shall, each year at a time specified by commission regulations, file a statement disclosing his investments, his interests in real property and his income during the period since the previous statement filed under this section or Section 87202. The statement shall include any investments and interest in real property held at any time during the period covered by the statement, whether or not they are still held at the time of filing."

17

Ricasa pled guilty to one misdemeanor count of violating Government Code section 89503 in December 2013.[16] In 2014, the other Sweetwater officials also entered guilty pleas. Quinones, Gandara and Sandoval all pled guilty to one felony count of engaging in a civil conspiracy to violate Education Code section 35230, in violation of Penal Code section 182, subdivision (a)(1), as well as one felony count of violating Government Code section 89503.

A typewritten factual narrative was incorporated into each defendant's plea form as the factual basis for the plea. For example, the typewritten narrative incorporated into Amigable's plea form provides:

> "Between March 9, 2007 and June 22, 2010 I provided gifts, meals and tickets to entertainment events directly to Jesus Gandara, Superintendent, Greg Sandoval, elected Board member, Arlie Ricassa, elected Board member, and Pearl Quinones, elected Board member, of the Sweetwater Union High School District. I provided the meals, tickets and gifts upon my initiative as sanctioned and encouraged by my employers. I also provided meals, tickets and gifts at the request of the elected board members and the Superintendant. The meals, tickets and gifts were made on behalf of my employers with the intent to influence the boards' decisions in granting construction contracts from the Sweetwater Union High School District to the firms for which I was working. My expenses were generated with the endorsement of my employers and they were reimbursed to me by my employers. At no time did the elected board members or Superintendent reimburse me or my employers for the meals, tickets or gifts I gave them on behalf of my employers."

---

16    Government Code section 89503, subdivision (a) prohibits state and local elected officers from "accept[ing] gifts from any single source in any calendar year with a total value of more than two hundred fifty dollars ($250)."

Similarly, the typewritten narrative incorporated into Sandoval's plea form provides:

> "Government Code § 89503: I received, reviewed, understood and biannually voted on Sweetwater's conflict of interest code delineating the Form 700 reporting requirements sent to the Sweetwater Board by the Superintendent. In 2008, I was an elected School Board Member for the Sweetwater Union High School District. I accepted gifts from Henry Amigable of Gilbane in 2008 with a total value of more than $2,770 and I did not report them. The maximum amount of gifts one may receive from one source per year as of 2008 was four hundred twenty dollars ($420). Henry Amigable provided these gifts with the intent to influence my vote on business awarded to Gilbane, his employer."[17] (Boldface omitted.)

Each plea form includes language to the effect that the individual entering the plea attests to the truth of the statements made in the plea under penalty of perjury and under the laws of the State of California, and is signed and dated by that individual. For example, Amigable's plea form states:

> "I declare under penalty of perjury, under the laws of the State of California, that I have read, understood, and initialed each item above, and any attached addendum, and everything on the form and any attached addendum is true and correct."

The plea forms of Flores, Quinones, Gandara and Sandoval all contain the identical "under penalty of perjury" language.[18]

---

[17] Although subdivision (a) of Government Code section 89503 provides that the maximum value of gifts a public official may accept from a single source is $250, subdivision (f) provides that the Fair Political Practices Commission may adjust this figure in each odd numbered year "to reflect changes in the Consumer Price Index, rounded to the nearest ten dollars ($10)."

[18] Although the plea forms of Quinones, Gandara and Sandoval were for pleas of guilty to felonies, and therefore differed in this respect from the forms signed by

19

Ricasa's plea form includes the following language, which is substantively identical, but presented in a slightly different format:

> "I DECLARE UNDER PENALTY OF PERJURY, under the laws of the State of California, that: (a) I have read, understood, and initialed each applicable item above and any attached addendum; and (b) everything on the form and any attached addendum is true and correct." (Boldface omitted.)

As Sweetwater points out, the plea forms that it submitted in opposition to defendants' anti-SLAPP motion "meet all requirements of declarations which are admissible as a hearsay exception under [Code of Civil Procedure section] 2009." Section 2009 of the Code of Civil Procedure outlines how and when an affidavit or declaration may be used, despite its hearsay nature: "An affidavit may be used to verify a pleading or a paper in a special proceeding, to prove the service of a summons, notice, or other paper in an action or special proceeding, to obtain a provisional remedy, the examination of a witness, or a stay of proceedings, and in uncontested proceedings to establish a record of birth, or *upon a motion*, and in any other case expressly permitted by statute." (Italics added.) In addition to Code of Civil Procedure section 2009, Code of Civil Procedure section 2015.5 explains that an individual making a statement by affidavit or declaration must attest to its truth under penalty of perjury pursuant to California law:

> "Whenever, under any law of this state or under any rule, regulation, order or requirement made pursuant to the law of this state, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn statement, declaration,

---

Amigable and Flores, they nevertheless contain the same "under penalty of perjury" language as the misdemeanor plea forms that Amigable and Flores signed.

verification, certificate, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with like force and effect be supported, evidenced, established or proved by the unsworn statement, declaration, verification, or certificate, in writing of such person which recites that it is certified or declared by him or her to be true under penalty of perjury, is subscribed by him or her, and (1), if executed within this state, states the date and place of execution, or (2), if executed at any place, within or without this state, states the date of execution and that it is so certified or declared under the laws of the State of California."

This provision states that, if executed within California, the "certification or declaration may be in substantially the following form:"

" 'I certify (or declare) under penalty of perjury that the foregoing is true and correct':
_____          _____
(Date and Place)                              (Signature)"

or, if executed anywhere in or outside of California, in the following form:

" 'I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct':
_____          _____
(Date)                                              (Signature)"

Each plea form submitted by Sweetwater with respect to the anti-SLAPP motion meets the requirements set forth in section 2015.5 of the Code of Civil Procedure. Specifically, each individual who signed and dated a plea form attested to the truth of the contents, including the factual basis of his or her plea, under penalty of perjury under the laws of California. For this reason, we conclude that the forms reflecting the guilty and no contest pleas, including the written factual narratives incorporated into the pleas, are in all material respects indistinguishable from declarations or affidavits.

21

Given that declarations and/or affidavits are admissible for purposes of pretrial motions (§ 2009), and because the statements in the plea forms are materially indistinguishable from statements that could be made in a declaration, in that the statements are based on the declarants' personal knowledge and the declarants have attested to the truth of the statements under penalty of perjury under the laws of California, we conclude that the court may consider the statements in the guilty pleas in the same way that it could consider declarations and/or affidavits.

The court in *Williams v. Saga Enterprises, Inc.* (1990) 225 Cal.App.3d 142 (*Williams*), similarly concluded that a trial court may consider a document that is akin to a declaration, for purposes of a summary judgment motion. (*Id.* at p. 149, fn. 3.) In *Williams*, the court permitted the use of prior testimony from an earlier case for purposes of a summary judgment motion. (*Ibid.*) The court observed that, although prior testimony from the earlier case "could not be received in this case [at trial] over a hearsay objection on the ground that it is admissible under the 'former testimony' exception" because there had been no showing that the declarant was unavailable as a witness, the recorded testimony from the earlier case "serves effectively as a declaration" and may be treated as such for purposes of a summary judgment motion. (*Ibid.*) We agree with the *Williams* court on this point, and conclude that the trial court did not err in considering for their truth out of court statements that otherwise meet the material requirements of a

declaration or affidavit, even if those statements were not presented in the form of a declaration or affidavit.[19]

We recognize that the plea forms and incorporated written factual narratives may not be admissible at trial, unless they meet the evidentiary rules for evidence that may be admitted despite its hearsay nature.[20] However, declarations and affidavits, which are a cornerstone of civil motion practice, are also typically not admissible at trial. A trial court should be able to consider out of court statements that meet the material requirements of a declaration and/or affidavit for purposes of deciding a pretrial motion.

For similar reasons, we conclude that the trial court may properly consider the transcripts of the grand jury testimony of Flores, Amigable, and former Sweetwater representatives Wright, Leyba, Bruce Husson, Jaime Mercado, Rafael Munoz, and Jaime Ortiz, in opposition to defendants' anti-SLAPP motion since they, too, are materially indistinguishable from declarations. (See *Williams*, *supra*, 225 Cal.App.3d at p.149, fn. 3.) Although the transcripts of the grand jury testimony are hearsay, and therefore inadmissible at trial unless they meet an exception to the hearsay rule, the transcripts are

---

[19] Because we conclude that the trial court properly considered the plea forms and the factual narratives incorporated into the forms, on the ground that they are not materially different from declarations, we need not address defendants' contentions that these documents may not be considered because they do not meet the requirements of other exceptions to the hearsay rule, such as the rule allowing party admissions.

[20] For example, the judgments of conviction entered as to Quinones, Gandara and Sandoval with respect to the felonies to which they pled guilty could be admitted at trial pursuant to the hearsay exception provided in Evidence Code section 1300: "Evidence of a final judgment adjudging a person guilty of a crime punishable as a felony is not made inadmissible by the hearsay rule when offered in a civil action to prove any fact essential to the judgment whether or not the judgment was based on a plea of nolo contendere."

23

of the same nature as a declaration in that the testimony is given under penalty of perjury. The grand jury transcripts, like the plea forms and the factual narratives incorporated into those forms, may be used in the same manner as declarations for purposes of motion practice.[21]

We acknowledge that at least one appellate court has criticized what it referred to as the *Williams* court's "casual view of trial testimony from another trial and declarations on summary judgment as being 'the same.' " (*Gatton v. A.P. Green Services, Inc.* (1998) 64 Cal.App.4th 688, 694 (*Gatton*), quoting *Williams*, *supra*, 225 Cal.App.3d at p. 149.)[22] In *Gatton*, *supra*, 64 Cal.App.4th at pages 693-695, the court disagreed with the *Williams* court's conclusion that testimony from the defendant's employee's criminal trial was admissible in opposition to a motion for summary judgment because "the effect of" the testimony of the witness was "the same as would be a declaration" supplied by that same witness (*Williams*, *supra*, 225 Cal.App.3d at p. 149).

Despite the *Gatton*'s court's objections to the analysis in *Williams* and its swipe at *Williams* as "a single, aberrant and unnoticed decision, not a well-rooted line of authority on which litigants could have placed reasonable reliance," (*Gatton*, *supra*, 64

---

21    Although defendants objected to the grand jury transcripts on grounds of both hearsay and lack of authentication in the trial court, defendants make no argument on appeal that the transcripts of the grand jury testimony are not what they purport to be, nor do they include a specific argument on appeal that that trial court erred in considering this evidence on the ground that it was not properly authenticated.

22    Another appellate court cites *Gatton* with approval and relies on *Gatton*'s reasoning over that of *Williams*. (See *L&B Real Estate v. Superior Court* (1998) 67 Cal.App.4th 1342, 1348.)  However, that case simply adopts wholesale, without further analysis, the *Gatton* court's conclusions. (*Ibid.*)  We do not find its agreement with *Gatton* to be independently persuasive.

Cal.App.4th at p. 696), we conclude that the reasoning of the *Williams* court is more persuasive than that of the *Gatton* court.

Rejecting the idea that prior testimony from a different case may be used in the same manner as a declaration, the *Gatton* court looked to Evidence Code section 1292, subdivision (a) in concluding that the Legislature requires "both unavailability, to ensure necessity, and a similar interest and motive in the prior proceeding, to ensure fairness," before prior testimony maybe admitted. In doing so, the *Gatton* court failed to appreciate the distinction between the substantive rules that govern the admission of evidence at trial and the rules that permit the use of evidence in hearsay form for purposes of motion practice. Evidence Code section 1292 governs the use of prior testimony as substantive evidence *at trial*, in the place of live testimony. Under those circumstances, the need for the safeguards of "unavailability" and "similar interest and motive" is substantial, given that the party is seeking to use the prior testimony *in the place of live testimony at trial*. However, as with declarations filed in support of or in opposition to any pretrial motion, a party seeking to use prior testimony in support of or in opposition to a pretrial motion is *not* seeking to use that testimony in the place of live testimony *at trial*. Rather, for purposes of supporting or opposing a pretrial motion, as here, the party is attempting to demonstrate to the court that that there is relevant and competent evidence that supports the party's claim(s). We see no reason why this cannot be done through the use of a statement by a witness made under oath or certified under penalty perjury under the laws of California in a plea form, or in grand jury testimony, rather than in a declaration,

25

which is simply an out of court statement by a witness, verified as to its truth and made under penalty of perjury under the laws of California.[23]

We reject the *Gatton* court's suggestion that the party proffering a declaration as evidence with respect to a pretrial motion must demonstrate that the declarant is willing and available to testify at trial, and that this is a reason to treat prior testimony differently from a declaration, for purposes of a pretrial motion. (*Gatton*, *supra*, 64 Cal.App.4th at p. 696.) The *Gatton* court noted the general rule that "for an affidavit to meet summary judgment standards, the affiant must show that if sworn as a witness he or she can testify competently to the evidentiary facts contained in the affidavit." (*Ibid.*) However, the *Gatton* court transmuted this into a requirement that the party provide some assurance that the witness would actually testify at trial in the case at issue, complaining that "[a] deposition from another case does not provide such assurance [that the affiant can testify competently] and is not readily subject to use in the action," that "there are questions whether the witness, even if alive, *can testify competently* to the deposition's contents," and that "[i]n our record, we also have only a representation by counsel that the witness

---

[23]     Sweetwater must demonstrate that it can present evidence that is "competent, relevant and not barred by a substantive rule." (*Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th 1138, 1147, as modified on denial of rehg. (May 18, 2004).) Although the evidence that Sweetwater has proffered is hearsay, it is hearsay in *form*, not *substance*. The distinction is this: if called to testify, each witness who signed a plea agreement and/or testified before the grand jury could competently testify to the facts that he or she describes in the plea forms and accompanying narratives and/or his or her grand jury testimony, without presenting hearsay evidence. In other words, the witnesses would not be presenting testimony that would be inadmissible as hearsay if their testimony were presented at trial.

26

Woodrow was 'still alive,' *not that he was well enough or willing to testify.*"  (*Ibid.*, italics added.)

In our view, in assessing the requirement that an affiant show that if sworn as a witness he or she "can" testify competently to the matters contained in his or her affidavit, the *Gatton* court was concerned about the wrong issue.  The concept that an affiant demonstrate that he or she "can" testify competently to the facts in an affidavit derives from the requirements for summary judgment set forth in Code of Civil Procedure section 473c, subdivision (d), which provides in relevant part:  "Supporting and opposing affidavits or declarations shall be made by a person on *personal knowledge*, shall set forth admissible evidence, and *shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavits or declarations*."  (Italics added.)  Thus, the summary judgment requirement for a witness declaration is not that the declarant be required to state that he or she *would* testify at trial if called in this action and demonstrate his or her competency as a witness, but rather, that the witness be able to provide a proper foundation for his or her testimony—i.e., demonstrate that the testimony is based on the declarant's own first-hand knowledge, such that he or she *could* provide competent testimony.  Persons who attest to the facts underlying their own guilty or no contest pleas in a criminal case, and persons who testify before a grand jury as to matters within their personal knowledge, have demonstrated that they are "competent to testify to the matters" (§ 473c, subd. (d)) that are the subject of the statements in their plea forms and/or grand jury testimony.  The significance is not that the person demonstrates that he or she is likely to actually testify at trial and can do so competently, but rather, that the

27

person is competent to testify as to the substance of his or her statements. The *Gatton* court focused on the contention that prior testimony should not be treated as equivalent to a declaration because it cannot provide assurances that the witness *would actually be able and/or willing to testify* in the current action. However, no such showing is required of declarations that are offered in support of or in opposition to summary judgment or other pretrial motions.

Further, admitting sworn documents and testimony in relation to an anti-SLAPP motion may be particularly warranted, in view of the discovery hurdles imposed by the filing of an anti-SLAPP motion. Given the automatic stay on discovery when an anti-SLAPP motion is filed (see § 425.16, subd. (g) ["[U]pon the filing" of an anti-SLAPP motion, "[a]ll discovery proceedings" shall be stayed unless the court orders otherwise "for good cause"]), there is a strong argument that a party should be permitted to oppose the motion with evidence that has all of the material characteristics of a declaration.

Finally, we reject the contention that because defendants did not have an opportunity to cross-examine the witnesses during their grand jury testimony, or with respect to their plea forms, this somehow makes it unfair for the trial court to consider the testimony or plea forms for purposes of an anti-SLAPP motion. Defendants are in precisely the same position they would be in if Sweetwater had submitted declarations by these witnesses—i.e., defendants would have had no opportunity to question the witnesses about the statements in their declarations. Indeed, the indicia of reliability and trustworthiness of statements made with respect to guilty and/or no contest pleas, as well as in testimony presented to a grand jury, *is at least as substantial*, *if not more*

28

*substantial*, than that of statements included in a self-serving declaration prepared expressly for the purpose of supporting or opposing a pretrial motion. Like declarations, such evidence demonstrates that there are witnesses who could testify as to the events at issue, and provides an indication of the manner in which those witnesses may testify. For this reason, the trial court should be able to consider such evidence, in the same way it would consider a declaration, for purposes of assessing a pretrial motion.[24]

The trial court did not abuse its discretion in considering the plea forms, including the incorporated plea narratives, the grand jury testimony, and grand jury exhibits in addressing defendants' anti-SLAPP motion. We therefore affirm the trial court's evidentiary rulings with respect to the evidence challenged by defendants on appeal.

C.      *Analysis of the anti-SLAPP motion*

1.      *Prong 1:  Arising from protected activity*

a.      *The complaint arises from protected activity*

To satisfy the initial burden of demonstrating that Sweetwater's complaint arises from protected activity, defendants must show that the act or acts underlying the claims fit one or more of the categories described in section 425.16, subdivision (e). (*Navellier*, *supra*, 29 Cal.4th at p. 88.) Subdivision (e) of section 425.16 provides that an " 'act in furtherance of a person's right of petition or free speech under the United States or

---

[24]     Because we conclude that the trial court did not err in considering the proffered excerpts of the grand jury testimony, there is no authentification issue with respect to the grand jury exhibits that Sweetwater proffered as evidence in opposition to defendants' anti-SLAPP motion. Defendants appear to accept that the documents used as exhibits during the grand jury testimony can be properly authenticated (and therefore, excepted from the hearsay rule under Evidence Code section 1271) by that testimony.

29

California Constitution in connection with a public issue' " includes "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law."  The anti-SLAPP statute also protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).) "The Legislature has decreed that courts 'broadly' construe the anti-SLAPP statute to further the legislative intent of encouraging 'continued participation in matters of public significance.' "  (*Kibler v. Northern Inyo County Local Hospital Dist*. (2006) 39 Cal.4th 192, 199.)

The complaint alleges that defendants' representatives provided certain public officials, as well as the officials' families and friends, with a variety of gifts and financial inducements, including "dinners at expensive restaurants," "[t]ickets to the theater and sporting events, including Charger games and to see The Jersey Boys," "[h]otel accommodations, food, and tickets to the Rose Bowl in Pasadena," "[a]irfare, hotel accommodations, wine tasting, and a hot air balloon ride in Napa Valley," and, significantly, "[m]onetary contributions to beauty pageants, charities, and campaigns on behalf of District officials."  (Underscoring omitted.)

Sweetwater apparently concedes that its complaint may implicate First Amendment concerns, since Sweetwater does not contend that the act or acts of which it complains were not taken "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a

30

public issue" (§ 425.16, subd. (b)(1).) Rather, Sweetwater argues that the sole reason that defendants' conduct is not protected under the statute is that the conduct is *illegal*, as a matter of law, and on this basis, is not entitled to the protections of the anti-SLAPP statute. Sweetwater's acknowledgement that the conduct, if not illegal as a matter of law, implicates First Amendment concerns, is well-taken. Lobbying government officials is an exercise of one's First Amendment rights of petition. (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33.) In addition, "[t]he making of a political campaign contribution is a type of political speech," since " '[a] contribution serves as a general expression of support for the candidate and his views, . . . .' " (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1365-1366 (*Paul for Council*), quoting *Buckley v. Valeo* (1976) 424 U.S. 1, 21.) There is no dispute that "lobbying and other activities seeking to influence the decisions of regulatory and legislative bodies fall within this definition" of protected acts. (*DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 566.) It is thus apparent that the principal thrust or gravamen of the complaint involves a challenge to political activity, thereby triggering the protection of the anti-SLAPP statute.

> b.     *There has been no concession, and the evidence does not conclusively establish, that the conduct at issue is illegal as a matter of law*

The parties disagree as to whether defendants' assertedly protected petitioning activity was *illegal as a matter of law* pursuant to the rule announced in *Flatley*, *supra*, 39 Cal.4th at page 320. The mere fact that the plaintiff *alleges* that the defendant engaged in unlawful conduct does not cause the conduct to lose its protection under the

31

anti-SLAPP statute, under the illegal-as-a-matter-of-law standard set out in *Flatley*. (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285.)  Even when a plaintiff alleges that the conduct at issue is unlawful, a defendant can satisfy his or her burden to show that he or she was engaged in conduct in furtherance of the right of free speech under the anti-SLAPP statute if the court cannot determine that the conduct at issue is illegal as a matter of law.  (See *Taus v. Loftus* (2007) 40 Cal.4th 683, 706-707, 713, 727-729 [defendants' investigation, including an interview that was allegedly fraudulently obtained, constituted protected activity].)  Defendants contend that Sweetwater has failed to demonstrate that the *Flatley* illegal conduct exception, which requires either a concession by a defendant or conclusive proof of illegality as a matter of law, applies.

Sweetwater suggests that defendants have conceded the illegality of the conduct at issue by "attaching the pleas to their anti-SLAPP moving papers and making an argument based upon the contents of these plea documents."  However, it is clear that defendants have not conceded this issue.  Defendants have argued in the trial court and on appeal that the guilty and/or no contest pleas do not establish that the conduct complained of in Sweetwater's complaint was illegal as a matter of law.  We therefore consider whether the evidence presented with respect to the anti-SLAPP motion conclusively establishes the illegality of the defendants' conduct.

Sweetwater's argument that the conduct is illegal as a matter of law is based on its assumption that because some of the individuals whose conduct is at issue in this case "ha[ve] a criminal conviction," they must necessarily have "engaged in illegal conduct" and therefore, the *Flatley* illegal conduct exception applies.  However, the question is not

32

whether an individual engaged in any illegal conduct. Rather, the question for our purposes is whether the *specific conduct that gives rise to the plaintiff's cause of action* is, as a matter of law, illegal, such that it is not entitled to the protections of the anti-SLAPP statute.

Although Sweetwater would have the court conclude that all of the conduct on which its complaint is based is illegal because many of the individuals involved entered pleas of guilty or no contest to certain criminal activity, the admitted illegal conduct evidenced by the guilty and no contest pleas does not necessarily overlap with the alleged violations of Section 1090 at issue in this case. None of the individuals pled guilty or no contest to a violation of Section 1090.[25] Rather, they entered pleas to single counts of other criminal offenses, leaving open the question whether much of the alleged conduct on which Sweetwater bases its claims was "illegal." While the evidence may establish that *some* of the conduct may have been illegal, the evidence does not establish that *all* of the conduct at issue was illegal as a matter of law.

For example, many of the former Sweetwater officials pled guilty to violating Government Code section 89503, which prohibits state and local elected officers from "accept[ing] gifts from any single source in any calendar year with a total value of more than [the amount set by the Fair Political Practices Commission]." However, some of the conduct Sweetwater alleges constitutes a violation of Section 1090 was the making of

---

[25]    Section 1090 prohibits government officials from being "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members," and also prohibits any individual from "aid[ing] or abet[ting]" a government official in violating the provision. (Gov. Code, § 1090, subds. (a) & (b).)

"[m]onetary contributions to beauty pageants, charities, and campaigns on behalf of District officials." These contributions were provided to entities other than the Sweetwater officials, and thus may not qualify as gifts "accepted" by the Sweetwater officials.[26] It is possible that the alleged contributions to pageants, charities and campaigns therefore did not form the basis of the guilty pleas entered by the Sweetwater officials to the charge of accepting gifts worth more than the requisite amount. The pleas by the Sweetwater officials to accepting gifts valued at more than the amount set by the Fair Political Practices Commission thus are not necessarily sufficient to establish that all of the conduct on which Sweetwater relies in attempting to void the contracts, which includes the making of contributions to third parties, was illegal as a matter of law.

As another example, Amigable pled guilty to a single violation of Education Code section 35230, a misdemeanor, which makes it illegal to "offer[ ] . . . any valuable thing to any member of the governing board of any school district, with the intent to influence his action in regard to the granting of any teacher's certificate, the appointment of any

---

26   Government Code section 82028 defines "gift" for purposes of Title 9 of the Government Code, in which section 89503 resides. A " '[g]ift' means [with certain exceptions] any payment that confers a personal benefit on the recipient, to the extent that consideration of equal or greater value is not received and includes a rebate or discount in the price of anything of value unless the rebate or discount is made in the regular course of business to members of the public without regard to official status." (Gov. Code, § 82028, subd. (a).) To the extent that contributions may have been provided to pageants, charities, and/or the political campaigns of persons other than the officials who are identified in the complaint, it would appear that those entities, not the public officials whose conduct is at issue here, would be the recipients on whom a benefit may have been conferred. Further, to the extent that any of the alleged campaign contributions may have been made to the campaigns of these officials themselves, the statute seems to expressly exclude from the definition of a "gift" contributions made to a political campaign that must be reported under other provisions of the Government Code. (See *id.*, subd. (b)(4).)

teacher, superintendent, or other officer or employee, the adoption of any textbook, or the making of any contract to which the board of which he is a member is a party . . . ." However, the complaint in this case describes much more conduct than a single violation of this statute. Amigable's plea thus can support a finding that only a single instance of offering a "valuable thing" to one of the former Sweetwater officials was done illegally, leaving open the question whether the other alleged acts of "offering" valuable things were done with the requisite illegal intent—i.e., with the intent of "influenc[ing] [the official's] action" (Ed. Code, § 35230).

Sweetwater asserts that *Paul for Council*, *supra*, 85 Cal.App.4th 1356 is "strikingly similar to the [case] before this Court," and argues that "[t]he criminal convictions attached to Appellants' original moving papers bring this case squarely within the same factual context as *Paul for Council* and *Flatley* and out of anti-SLAPP protection." Paul was a city council member who sought reelection. He sued the defendants, alleging that they had influenced the election with illegal campaign contributions to one of Paul's opponents. (*Id.* at pp. 1360-1361.) The defendants filed an anti-SLAPP motion in which they essentially conceded that they had violated the Political Reform Act by reimbursing family members for contributions made to candidates. (*Id.* at p. 1361.) Despite finding that the defendants' conduct was illegal, the trial court concluded that the conduct was protected by the anti-SLAPP statute, and therefore granted the defendants' motion and dismissed the plaintiff's complaint. (*Id.* at p. 1362.) The plaintiffs appealed, and on appeal, the court considered whether the conduct forming the basis of the complaint was entitled to protection under the anti-SLAPP

35

statute, despite its illegality. (*Id.* at pp. 1362-1363.) The *Paul for Council* court reversed, concluding that the anti-SLAPP statute does not protect conduct that defendants concede is illegal. (*Ibid.*)[27]

Significantly, the defendants in *Paul for Council conceded* that their conduct was illegal, but argued that despite the illegality, their conduct was nevertheless entitled to the protections of the anti-SLAPP statute. (*Paul for Council*, *supra*, 85 Cal.App.4th at p. 1366 ["Defendants contend their campaign money laundering activity was taken '*in furtherance*' of their constitutional right of free speech, and therefore such activity comes within the parameters of section 425.16's protection, even though such activity was found to be illegal"].) The same is not true here. Defendants do not concede that all of the conduct underlying Sweetwater's complaint was illegal. As a result, *Paul for Council* is not as similar to this case as Sweetwater suggests, and it is clearly not controlling.

While Sweetwater *alleges* that all of the gifts and lobbying efforts mentioned in its complaint were part of an illegal scheme, the allegation that all of this conduct was illegal is not sufficient to establish, as a matter of law, that the conduct was, in fact, illegal. Whether the requisite "financial interest" in the contracts exists is a question more appropriately considered in the second part of the analysis—i.e., whether Sweetwater has

---

[27] The Supreme Court later relied on *Paul for Council* in creating the illegal-as-a-matter-of-law standard with respect to assessing whether assertedly protected conduct is entitled to the protections of the anti-SLAPP statute. (*Flatley*, *supra*, 39 Cal.4th at pp. 313-318.)

36

demonstrated a probability that it will prevail on the merits of its claims.[28] We therefore turn to this question.

2.     *Prong 2:  A probability of prevailing*

As we have already stated, "in order to establish the requisite probability of prevailing (§ 425.16, subd. (b)(1)), the plaintiff need only have ' "stated and substantiated a legally sufficient claim." ' [Citations.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier*, *supra,* 29 Cal.4th at pp. 88-89.)

Sweetwater's first two causes of action seek to void the contracts with defendants pursuant to Section 1090.  "Section 1090 provides in relevant part:  'Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members.'  It codifies the long-standing common law rule that barred public officials from being personally financially interested in the contracts they formed in their official capacities." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1072 (*Lexin*).)  Section 1090 embodies the idea that the duties of public office demand absolute loyalty and undivided allegiance from an individual who holds that office.  (*Thomson v. Call* (1985) 38 Cal.3d 633, 648.)

---

28     If there is a factual dispute about the legality of the defendant's conduct, that dispute is not properly resolved under the first step of the SLAPP analysis, but instead, should be addressed in connection with the plaintiff's burden to show a probability of prevailing on the merits in the second step. (*Flatley*, *supra*, 39 Cal.4th at p. 316.)

The *Lexin* court explained the purpose of Section 1090:

"The common law rule and section 1090 recognize '[t]he truism that a person cannot serve two masters simultaneously . . . .' (*Thomson v. Call* (1985) 38 Cal.3d 633, 637 [214 Cal.Rptr. 139, 699 P.2d 316]; see *Stockton P. & S. Co. v. Wheeler* (1924) 68 Cal.App. 592, 601 [229 P. 1020] [the bar against being financially interested in the contracts one makes in an official capacity 'is evolved from the self-evident truth, as trite and impregnable as the law of gravitation, that no person can, at one and the same time, faithfully serve two masters representing diverse or inconsistent interests with respect to the service to be performed'].) 'The evil to be thwarted by section 1090 is easily identified:  If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality.' (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1330 [44 Cal.Rptr.3d 881].)  Where public and private interests diverge, the full and fair representation of the public interest is jeopardized.

"Accordingly, section 1090 is concerned with ferreting out any financial conflicts of interest, other than remote or minimal ones, that might impair public officials from discharging their fiduciary duties with undivided loyalty and allegiance to the public entities they are obligated to serve.  (*Stigall v. City of Taft* (1962) 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289].)  Where a prohibited interest is found, the affected contract is void from its inception [citation] and the official who engaged in its making is subject to a host of civil and (if the violation was willful) criminal penalties, including imprisonment and disqualification from holding public office in perpetuity." (*Lexin*, *supra*, 47 Cal.4th at p. 1073.)

"Section 1090 has been interpreted liberally to prohibit any form of self-dealing. [Citations.]  The statute cannot be given 'a narrow and technical interpretation that would limit [its] scope and defeat the legislative purpose.'  [Citations.]  Section 1090 is triggered when a public official receives any profit from a public contract and includes the acceptance of a bribe in return for influencing the public entity to enter into a particular contract."  (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 549-550.)

38

"The defining characteristic of a prohibited financial interest is whether it has the potential to divide an official's loyalties and compromise the undivided representation of the public interests the official is charged with protecting. [Citation.] Thus, that the interest 'might be small or indirect is immaterial so long as it is such as deprives the [people] of his overriding fidelity to [them] and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good.' " (*Lexin*, *supra*, 47 Cal.4th at p. 1075.)

"To determine whether section 1090 has been violated, a court must identify (1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable financial interest in that contract, and (3) (if raised as an affirmative defense) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests." (*Lexin*, *supra*, 47 Cal.4th at p. 1074.)

Defendants contend that the types of financial interests in contracts that Section 1090 prohibits are of "three kinds." These "three kinds" include "direct financial interests," "indirect financial interests, as when the public official has a family member or a business that has a direct financial interest in the contract," and "financial interests arising from the contracting process, as when a party to the contract bribes a public officer to vote for the deal." Defendants assert that the only possible financial interest that could be alleged here is the third kind. We agree. There is no allegation in the complaint that the former Sweetwater officials had a financial interest in the contracts in

question arising directly or indirectly from the fruits of the contracts—i.e., there is no allegation that any official stood to gain economically from the performance of the contracts. Rather, Sweetwater's complaint alleges that the former Sweetwater officials had a financial interest in the relevant contracts as a result of activities that occurred during the contracting process and/or in the making of the contracts.

Section 1090 has been interpreted to encompass financial interests arising from making of the contract or the contracting process, and not simply financial interests that arise from the fruits of a contract. (See *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114, 1131 (*Hub City*) [defendants presented incorrect reading of law when arguing that the prohibited financial interest must be " 'in' the contract, not ancillary to it," and that " 'bribery is not an interest in the agreement under section 1090' "]; *Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1333 (*Carson*) [rejecting argument that "tainted public contracts" can "escape avoidance under section 1092 as long as bribes, extortion payments or other favors received by the public officials cannot be linked directly to the terms of those tainted public contracts"]; see also *People v. Honig* (1996) 48 Cal.App.4th 289, 315 (*Honig*) ["The law does not require that a public officer acquire a transferable interest in the forbidden contract before he may be amenable to the inhibition of the statute, nor does it require that the officer share directly in the profits to be realized from a contract in order to have a prohibited interest in it"].) As the *Carson* court explained:

> "The phrase 'financially interested' broadly encompasses anything that would tie a public official's fortunes to the existence of a public contract. This interpretation furthers the Legislature's purpose,

40

which is to regulate the conduct of public officials. To construe the statute narrowly would permit certain categories of schemes and improprieties to go unchecked, a result which would undermine the public's confidence not only in the government, but in the court system ruling on such cases. An important, prophylactic statute such as section 1090 should be construed broadly to close loopholes; it should not be constricted and enfeebled." (*Carson*, *supra*, 140 Cal.App.4th at p. 1335.)

For purposes of Section 1090, the making of a contract "encompasse[s] the planning, preliminary discussion, [and] compromises . . . that le[a]d up to the formal making of [a] contract." (*Honig*, *supra*, 48 Cal.App.4th at p. 315.) Section 1090's prohibition against a public official having a financial interest in contract has been broadly interpreted to include financial interests such as those arising as a result of the gifts and contributions that Sweetwater alleges the defendants provided to former Sweetwater officials during the contracting process.

Defendants argue that case law demonstrates that a plaintiff must show the existence of a quid pro quo arrangement in order to establish a violation of Section 1090 by way of the existence of a financial interest arising from the contracting process itself, citing a number of cases that included a quid pro quo arrangement. (See *Hub City*, *supra*, 186 Cal.App.4th at p. 1127; *People v. Wong* (2010) 186 Cal.App.4th 1433, 1451; *Carson*, *supra*, 140 Cal.App.4th at p. 1334; *Campagna v. City of Sanger* (1996) 42 Cal.App.4th 533, 540-541; *People v. Vallerga* (1977) 67 Cal.App.3d 847, 866.) Sweetwater vehemently disagrees with defendants' contention that Section 1090 "requires evidence of a quid pro quo relationship between a public official's vote and the gifts he or she received." It is not necessary for us to determine whether a plaintiff asserting a

41

Section 1090 claim must demonstrate the existence of a quid pro quo arrangement in every instance, because we conclude that even if such a showing is required, Sweetwater presented evidence from which one could reasonably infer that a quid pro quo arrangement existed, even if there is no direct evidence that the parties explicitly discussed such an arrangement.[29]

The evidence of the plea forms detailing the guilty and no contest pleas by various former Sweetwater officials and former employees of defendants, as well as the grand jury testimony of a number of the individuals involved, is circumstantial evidence from which one could reasonably conclude that the gifts and contributions were made in order to sway the board members to vote in favor of awarding contracts to Gilbane and the Joint Venture. Amigable, a Gilbane employee, stated under penalty of perjury that he "provided the meals, tickets and gifts upon [his] initiative as sanctioned and encouraged by [his] employers," and that these "meals, tickets and gifts were made on behalf of [his] employers with the intent to influence the boards' decisions in granting construction contracts from the Sweetwater Union High School District to the firms for which [he] was working." SGI's CEO, Flores, stated that he provided donations, meals, gifts, and tickets to entertainment events to certain Sweetwater officials, "as requested by these

---

29    Both direct and circumstantial evidence may be considered for purposes of Section 1090. (*Hub City*, *supra*, 186 Cal.App.4th at p. 1127.) To the extent that defendants are arguing that there must be direct proof that representatives of Gilbane or the Joint Venture bribed the former Sweetwater officials, we reject such a proposition. (See *ibid.* ["Financial interests prohibited by section 1090 'are not limited to express agreements for benefit and need not be proven by direct evidence. Rather, forbidden interests extend to expectations of benefit by express or implied agreement and may be inferred from the circumstances' "].)

public officials," and admitted that none of the officials reimbursed him for the meals, gifts, tickets, or donations. Many of the same officials to whom Amigable and Flores admitted giving meals, tickets and gifts admitted that they received the gifts. For example, Quinones and Sandoval acknowledged not only that they received gifts from Amigable, but that they were aware that Amigable "provided these gifts with the intent to influence my vote on business awarded to Gilbane, his employer." Ricasa admitted that in 2009, she accepted gifts from Flores with a value of more than $2000, and that she was aware that Flores "provided these gifts with the intent to influence my vote on business awarded to Seville Group, Inc." Gandara also admitted to accepting gifts of significant value from Flores, and that he was aware that Flores had provided the gifts "with the intent to influence my decision on business awarded to SGI, his company."

In addition, there is evidence that Sweetwater, through the actions of its Board, which at the time included the members whose conduct is at issue here, not only awarded the Proposition O construction work to defendants, but also replaced the contractor that had been the program manager on Proposition BB construction projects with the Joint Venture, despite the fact that the original contractor had been performing well, and that hiring a different contractor to do the Proposition O work would cause a significant delay. The evidence presented in opposition to the anti-SLAPP motion demonstrates that the Sweetwater Board had hired Harris/Gafcon to be the program manager for the Proposition BB construction projects. There is also evidence that Harris/Gafcon "finished the Prop[osition] BB projects that they were managing ahead of time," and "[t]heir work quality was very good." Katy Wright, Sweetwater's Director of Planning

43

and Construction, and at one point Interim Assistant Superintendent, who "was directly involved with the management of the Proposition BB construction bond," attested that when she heard that Gandara was not planning to use Harris/Gafcon for the new Proposition O construction work, she informed Gandara that "the District would essentially lose a year because it would take a while for a new team to get up to speed and understand what happened at each of the campuses." She also "relayed" to Gandara "the good quality of work that [Harris/Gafcon] performed for the District on Proposition BB." In addition, despite Wright's expertise "with respect to managing the work done under the bond measures," she was "not asked to participate or provide the criteria by which the program manager was to be selected," and was "not allowed to participate" in the decision to select the Joint Venture even after she asked to participate. Sweetwater officials, including the officials whose conduct is alleged to have been unlawful, ultimately voted to replace Harris/Gafcon with the Joint Venture to manage the bond projects.

One could reasonably infer from the chronology of campaign contributions and excessive gift giving, together with Sweetwater's action in awarding to the Joint Venture the contract for management of the Proposition O projects, as well as removing management of the Proposition BB projects from Harris/Gafcon in favor of the Joint Venture, that the former Sweetwater officials identified in the complaint were influenced to award contracts to the Joint Venture as a result of the gifts and contributions that Gilbane and the Joint Venture provided to them. Sweetwater has thus made a prima facie showing of facts sufficient to sustain a favorable judgment in its favor. We conclude that

44

Sweetwater has demonstrated a probability of prevailing on its Section 1090 claims against defendants, thereby defeating defendants' anti-SLAPP motion with respect to the second prong of the anti-SLAPP analysis.

IV.

DISPOSITION

The trial court's order denying defendants' anti-SLAPP motion is affirmed. Costs are awarded to Sweetwater.


AARON, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.